**W. A. SHEAFFER PEN COMPANY, a Division of Textron, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 72–1778, 73–1007.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 10, 1973.

Decided Oct. 11, 1973.

Rehearing and Rehearing En Banc Denied Nov. 20, 1973.

Paul J. Spielberg, Atty., N. L. R. B., Washington, D. C., for the N.L.R.B.

William G. Haynes, Topeka, Kan., for W. A. Sheaffer Pen Company.

Before GIBSON and BRIGHT, Circuit Judges, and SMITH,* Senior District Judge.

GIBSON, Circuit Judge.

This case is before us on a petition for review of an order of the National Labor Relations Board by W. A. Sheaffer Pen Company (Company). The Board cross-petitions for enforcement. Determining that the Company violated § 8(a)(1) of the National Labor Relations Act,[1] the Board ordered the Company to cease and desist from an unfair labor practice by removing from its personnel files and destroying certain questionnaires and any information derived therefrom. The Board's decision and order is reported at 199 N.L.R.B. No. 21.

---

* The Honorable Talbot Smith, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. 29 U.S.C. § 158(a)(1).

The only issue presented is whether or not the Company's use of a questionnaire[2] to ascertain whether prospective employees would cross a picket line in the event of a strike was a violation of § 8(a)(1), in that it interfered with, restrained, or coerced employees in the exercise of their § 7 rights to organize and bargain collectively.

In September, 1968, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (Union) and the Company signed a collective bargaining agreement that contained a no-strike clause and was due to expire on October 1, 1971. In July, 1971,[3] the Union gave notice of its intention to reopen the contract, and the first bargaining meeting was held on August 17th. Beginning August 20th and continuing through September 29th, the contested questionnaires were attached to the Company's employment applications. On September 30th, the Company discontinued using the questionnaire, because the Union had agreed to an indefinite extension of the old contract with a 10-day notice of termination provision. On October 31st, the Union gave notice it would strike November 11th, unless agreement on a new contract was reached. Use of the questionnaire was resumed November 4th and continued until November 22nd, when a new contract was signed.[4]

The administrative law judge concluded that the questionnaire's use was a violation of § 8(a)(1), because no assurances against reprisal were included in the questionnaire, as required by Struksnes Construction Co., 165 N.L.R.B. No. 102, 65 L.R.R.M. 1385 (1967). The Board adopted this conclusion.

On appeal, the Company argues that it had substantial justification for use of the questionnaire; that without a showing of anti-union animus, such questioning does not constitute a § 8(a)(1) violation; and that the Board improperly applied a *per se* rule in finding an unfair labor practice.

■■ It is established that a company has the right to hire permanent replacements for economic strikers. N.L.R.B. v. MacKay Radio & Telegraph Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). The Company would have us extend that right to make any company conduct to locate replacements lawful under the Act. We do not believe that the right to hire replacements gives an employer automatic immunity for conduct violative of the Act. *See* N.L.R.B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). It is conceded that the Company did not comply with the standards set out in *Struksnes*[5] in that no assurances against reprisal were given.

---

2. The questionnaire involved was attached to the Company's regular employment application and no specific mention was made of the question to prospective employees when they made application for employment. The questionnaire read:

"The W. A. Sheaffer Pen Company is currently engaged in contract negotiations. In the event of a strike, the plant may be picketed. Would you be willing, under these conditions, to cross a picket line when entering or leaving the plant?

_____ Yes

_____ No

---

(Signature and date)"

3. All dates hereinafter also occurred in 1971.

4. The record shows that 649 applicants were given applications with the questionnaire attached; 440 made "yes" answers, 185 made "no" answers, and 14 did not answer. We note that these totals only add up to 639, but there is no explanation in the record as to the status of the missing 10 applicants.

5. The Board in *Struksnes Construction Co.*, *supra*, held:

"Absent unusual circumstances, the polling of employees will be violative of Section 8(a)(1) of the Act unless the following safeguards are observed: (1) the purpose of the poll is to determine the truth of a union's claim of majority, (2) this purpose is communicated to the employees, (3) assurances against reprisal are given, (4) the employees are polled by secret ballot, and (5) the employer has not engaged in unfair labor practices or otherwise created a coercive atmosphere."

165 N.L.R.B. at 1063.

In adopting the *Struksnes* standards in N.L.R.B. v. Harry F. Berggren & Sons, Inc., 406 F.2d 239, 244 (8th Cir. 1969), this Court found they were "soundly based in an attempt to balance the right of management to communicate with its employees and the employees' statutory rights to be free from interference, restraint and coercion in engaging in organizational activity." Although this Court adopted the *Struksnes* standards in a case dealing with employer interrogation to determine a union's majority status, the standards apply equally well to this case.

The questioning in this case carried with it the inherent implication that the answer given would have affected the applicants' chances of employment. Since the questionnaire became a part of the applicants' permanent personnel records, we think that the applicants had a reasonable apprehension that their answer could have been used to affect future job security. Such an atmosphere created a fear of economic reprisal. Since the applicants knew that they were being solicited as possible replacements for striking workers, the questionnaire's use was likely to serve as an implied threat or warning to the prospective employees of possible adverse consequences of any participation in concerted activity. As was found in *Berggren*:

> "These adverse effects can follow interrogation regardless of the employer's motive. Thus, if employees' rights are not to be subject to derogation by the right of management to poll employees for a legitimate purpose, all of the safeguards enunciated in *Struksnes* should be observed." (footnotes omitted).

*Berggren, supra* at 245.

Requiring compliance with these standards does not constitute enforcing a *per se* rule, since these standards represent a proper *balancing* of the employees' right to organize and the employers' right of communication.

Viewing the totality of the circumstances surrounding use of the questionnaire and its unmistakable potential for abuse of the employees' protected § 7 rights, we think the Board's decision finds substantial support in the record as a whole. Accordingly, the Board's petition for enforcement of its order is granted.