## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## DOUGLAS DIVISION, the SCOTT AND FETZER COMPANY, Respondent.

### No. 77–1386.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 17, 1977.

Decided Feb. 14, 1978.

Jesse I. Etelson, Atty., National Labor Relations Board, Washington, D. C. (argued), Paul J. Spielberg, Deputy Asst. Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, National Labor Relations Board, Washington, D. C., on brief, for petitioner.

Jon C. Flinker, Cleveland, Ohio (argued), and C. Douglas Lovett, Cleveland, Ohio, on brief, for respondent.

Before GIBSON, Chief Judge, HEANEY, Circuit Judge, and HUNTER, District Judge.*

GIBSON, Chief Judge.

The National Labor Relations Board (Board) petitions for enforcement of its order of March 22, 1977, against respondent Douglas Division, The Scott and Fetzer Company (Company). The Company maintains a plant with approximately 70 employees in Walnut Ridge, Arkansas, for the manufacture of vacuum cleaners, carpet cleaners and custom molded parts. Employees at the Walnut Ridge plant have not been represented by a union since the plant's opening in 1972. In late 1975, the International Association of Machinists and Aerospace Workers, AFL–CIO (Union) undertook a campaign to organize the plant. The conduct of the Company during this campaign became the basis of an unfair labor practice charge filed by the Union on October 24, 1975. After a hearing on the charge, an administrative law judge found that the Company had violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C.

---

* The Honorable Elmo B. Hunter, United States District Judge, Western District of Missouri, sitting by designation.

§ 158(a)(1), by threatening employees that it would close the plant if they chose the Union as their collective-bargaining representative, by coercively interrogating employees concerning their activities and sympathies and by creating the impression that the union activities of its employees were under surveillance. The administrative law judge held that certain other alleged unfair practices had not been proved and recommended that they be dismissed. The Board affirmed the rulings, findings and conclusions of the administrative law judge and adopted his recommended order.[1] The Board now petitions for enforcement of its order. We hold that the Board's order was not supported by substantial evidence and, accordingly, deny enforcement.

The Union's organizational campaign began in late September 1975. During October, managerial personnel questioned one employee specifically about the Union campaign and asked two employees for their opinions of an anti-union letter which the Company had circulated. In the first instance, Brenda Gaither was questioned about the campaign and asked why employees were organizing. She responded that employees were organizing in order to obtain higher wages, better working conditions and better benefits; she also provided the Company with the name of the union attempting to organize employees. In the latter two instances, Henrietta Tate and William Allen were asked for their responses to an October 16 anti-union letter sent by the Company to all employees. Tate was told that she and Allen were considered "[two] of the biggest ducks in the puddle." She responded: "It's more than just one or two. It's more like everybody." Allen was unresponsive to the questioning.

Four other employees were simply asked, without specific reference to the Union or campaign, about their feelings or thoughts on the "mess", "problem", or "trouble". Three of these employees gave responses indicating that they did not know what the question was about. One employee did advert to the Union in her response, suggesting that the employees needed someone to go to with their problems. On the basis of these incidents, the Board found that the Company had violated § 8(a)(1) of the Act by interrogating employees and creating an impression of surveillance.

During the organizational campaign, a rumor began to circulate among employees to the effect that the Walnut Ridge plant would be closed if the Union came into the plant. This rumor was repeated to Plant Manager McGarry by an employee in early October 1975. McGarry immediately responded that this would not happen. In an October 16 letter to employees, the Company announced its opposition to the Union. This letter, which has been conceded to be legal, closed with a reminder to employees that the Walnut Ridge plant, which was all they had, was just one small part of a company with plants all over the country. In the course of a meeting with employees on November 6, McGarry was again questioned about the rumor that the Walnut Ridge plant would close if the Union came in. As he had done before, McGarry gave his assurance that the plant would not shut down if the Union came in.

On November 13, McGarry sent a letter to all employees, detailing the history of the Walnut Ridge plant. This letter explained that the operations now conducted in Walnut Ridge had originally been based at a plant in Bronson, Michigan; that employees at Bronson had been represented by a union; and that collective bargaining in Bronson had produced high costs which led to the relocation of the Bronson operations in Walnut Ridge. The letter pointed out that the union had not been able to prevent the Bronson employees from losing their jobs and advised, "Now it's *your* plant and *your* job, and you should be very careful before you decide to bring a union in this plant. Think about it." This letter was also read to employees. On November 26, more than two weeks prior to the scheduled election, McGarry circulated another letter to employees about the relocation of the Bronson plant and the rumored closing of the Wal-

---

1. The Board's decision and order are reported at 228 N.L.R.B. No. 124 (1977).

nut Ridge plant. This letter, which also contained an apology for previous questioning of employees, was both sent and read to all employees.[2] On the basis of these letters and comments, the Board found that the Company had violated § 8(a)(1) of the Act by threatening employees that it would close the Walnut Ridge plant if they chose the Union as their collective-bargaining representative.

We are required to uphold a factual finding by the Board if it is supported by substantial evidence considered on the record as a whole. 29 U.S.C. § 160(e). After a careful examination of the record in this case, we conclude that there is not substantial evidence supportive of the Board's findings that the Company engaged in coercive interrogation of employees, created an impression of surveillance or threatened employees that it would close the plant if the Union became their collective-bargaining representative.

*Interrogation of employees and impression of surveillance*

■ The unfair labor practice defined by § 8(a)(1) of the Act is that of an employer's interfering with, restraining or coercing employees in the exercise of their right to self-organization. 29 U.S.C. § 158(a)(1). Section 8(a)(1) cannot be read as a prohibition, per se, of employer questioning of employees relative to unionization. *NLRB v. North American Manufacturing Co.*, 563 F.2d 894, 896 (8th Cir. 1977). Rather, this section makes it an unlawful labor practice for an employer to interrogate employees in a coercive manner which interferes with, restrains or threatens employees' right of self-organization protected by § 7 of the Act. 29 U.S.C. § 157. Questioning which does not coerce or restrain employees in their right to organize is permissible; when properly exercised it is protected by the constitutional right to freedom of speech, which is recognized in § 8(c) of the Act:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c).

■ We do not believe that the record in the present case, considered as a whole,

---

**2.** The November 26 letter provided:

*Fact # 1 Revisited—The Company is not going to close our plant if the union wins the election!* Quite frankly, when a group of our plant employees asked to meet with me on November 6th, somebody asked me if the Company was planning on closing the plant if the union won the election, and I answered "NO." I guess that's why I'm a little surprised and upset about this complaint that I threatened to close the plant.

Now that I've said that, I believe I also ought to repeat some of the things I said back in Fact # 1. You see, it really is true that the Douglas operations in Walnut Ridge used to be in Bronson, Michigan. Before our plant opened in 1972, Douglas made all of its vacuum cleaners up in Bronson, and those cleaner employees belonged to one of the biggest unions in the world and they had a fine union contract. And then in 1972 Douglas built this new plant in Arkansas and now we are making all of Douglas' vacuum cleaners, and a lot of nice people in Michigan lost their jobs.

That's right—now it's *your* plant and *your* job and *your* wages and *your* benefits. And to be completely truthful, the reason our plant and our jobs are in Arkansas instead of Michigan is because collective bargaining simply pushed the costs of making vacuum cleaners too high, and Douglas couldn't be competitive with other cleaner companies. That's not a threat—it's a fact—and it's Fact # 1. Think about it.

P.S. I just talked to one of the Company lawyers and he wants me to let everybody know that the Company is completely opposed to any interrogation or surveillance concerning union activities. Quite frankly, all of these legal rules are pretty hard for me to understand and I know that I haven't intentionally done anything wrong. However, if I have questioned any of you about your union feelings, I want to apologize and assure you that I won't do it again—and that also goes for Dave and Nate and Al. All we want is a fair campaign with a lot of honest talk about some of the problems and difficulties that can come from this union and collective bargaining—just the Facts—nothing more and nothing less.

contains substantial evidence of coercive interrogation. The questioning involved here may fairly be characterized as casual and sporadic. In three of the seven incidents of purportedly coercive interrogation cited by the Board, neither party to the conversation mentioned the Union or the organizational campaign at all. Several of these conversations were described as having taken place in a joking atmosphere. Few of the small number of employees questioned appear to have perceived that they were being asked about the Union or, if they did, to have felt compelled to answer. We are convinced that, under the circumstances here, the noncommittal nature of some of their answers is a reflection of the ambiguity and casualness of the questions posed rather than independent evidence of the coerciveness of the questions. *But cf. Federal Prescription Service, Inc. v. NLRB*, 496 F.2d 813, 816 (8th Cir.), *cert. denied*, 419 U.S. 1049, 95 S.Ct. 624, 42 L.Ed.2d 643 (1974) (evasive answers deemed indicative of coercive nature of inquiry).

While the Company was forthright in expressing its opposition to the Union, most of its formal communications to employees about the Union took place after the conversations at issue here, and we do not believe that the atmosphere at the plant at the time of the Company's casual inquiries was one of such hostility to the Union as to render these otherwise innocuous and infrequent questions coercive. Finally, we note that on November 26, the Company disseminated to employees an apology for its questions, a disavowal of any illegal intent incident thereto and an assurance that no further questioning would occur.

Upon a review of the record as a whole, we conclude that the Company's questioning of its employees was not coercive and did not create an impression of surveillance. It appears here that there was no restraint or coercion, and that any isolated and limited interference with the employees' right to organize that may have occurred, took place early in the campaign, was rescinded and expressly disavowed. This limited and isolated interrogation certainly was not carried on through the heart of the campaign. Under these circumstances, we believe that even if the conversations are assumed to have been violative of § 8(a)(1), they were nevertheless so isolated and insubstantial that a remedial order should not issue. *NLRB v. Talbot-General Wire Products, Inc.*, 419 F.2d 824, 825 (8th Cir. 1969); *NLRB v. M & W Marine Ways, Inc.*, 411 F.2d 1070, 1073 (5th Cir. 1969).

*Threatened closing of the Walnut Ridge plant*

An employer's threat to close a plant constitutes an unfair labor practice if it is reasonably likely to restrain employees in the exercise of their right to self-organization. *Chemvet Laboratories, Inc. v. NLRB*, 497 F.2d 445, 449 (8th Cir. 1974). The Board found that the Company's letters and statements, which informed employees that the Walnut Ridge plant was but one small part of a large organization, and referred to the relocation of the Bronson, Michigan, plant, constituted such an unlawful threat. Our review of the record as a whole convinces us that this finding is unsupported by substantial evidence. Moreover, we note that we need not defer to the Board's finding on this issue because, for the reasons set forth below, we do not consider that the statements involved are "as readily susceptible of interpretations as coercive threats as they are of honest forecasts." *Royal Typewriter Co. v. NLRB*, 533 F.2d 1030, 1038 (8th Cir. 1976). To the contrary, we believe that the record reveals a wholly inadequate basis for inferring that the Company's statements were coercive or threatening.

We note initially that the record is devoid of any evidence that the Company ever made a direct threat to close the Walnut Ridge plant during the organizational campaign. Indeed, in response to a rumor circulating among employees to the effect that the plant would be closed if the Union came in, the Company consistently and emphatically denied that selection of the Union as a collective-bargaining representative would result in the closing of the plant. Thus, because there were no direct threats,

the threatening or coercive nature of the challenged statements must be inferred, and the context in which these statements were made must be carefully examined in order to determine whether it supports an inference of coercion.

The Board attempts to delineate the context here as one characterized by a "strong anti-union stance" on the Company's part. The Board contends that this context was created by conduct including "a series of coercive interrogations and the creation of the impression of surveillance of the employees' union activities." Particular reliance is also placed upon an October 16 letter in which the Company made reference to the fact that the Walnut Ridge plant was just one part of a large company with plants all over the country. This letter has been conceded to be legal, however. Moreover, we have rejected, as unsupported by substantial evidence, the Board's findings that the Company engaged in coercive interrogation or created an impression of surveillance. Thus, the key indicia of hostility and anti-union animus relied upon by the Board to support the finding that the Company's statements were threatening are not available to support an inference of coercion. We do not believe that the record, when considered in the absence of these unproved indicia, can support the finding that the Company's statements constituted a threat to close the Walnut Ridge plant in violation of § 8(a)(1). The Company went on the record, in writing, that it would not close the plant if the Union won the election. The context of the Company's noncoercive statements did not transmogrify them into threats.

An employer's free speech right to communicate his views to his employees is firmly established. Section 8(c) of the Act statutorily recognizes an employer's first amendment rights. 29 U.S.C. § 158(c). Management-labor controversies do present conflicting priorities, however. While employees have a right to organize, statutorily protected by § 7 of the Act, this right must be balanced with the employer's constitutional and statutory right to communicate with employees on matters of mutual concern. *W. A. Sheaffer Pen Co. v. NLRB*, 486 F.2d 180, 182 (8th Cir. 1973). In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court provided guidelines for striking the often delicate balance between this right to free speech and the rights of employees to organize freely:

> [A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment. (Citations omitted.)

*NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). We have subjected the Company's statements regarding the closing of the Bronson plant and the size of the Walnut Ridge operation to careful scrutiny under these guidelines and we do not find them to be threats violative of § 8(a)(1). The Company's letters contained historical and factual recitals of the problems following unionization at its Bronson, Michigan, plant; they expressed hard economic facts of costs outrunning competitive markets. These expressions were not intimidating and contained no threats of reprisal, no threats of any unilateral decision to close the plant, and no force or any promise of

benefit. An employer has the right to oppose the unionization of its employees; this right is countered and balanced by the employees' right of concerted action in advancing their demands and interests. The expression of the Company's views here appears to fall well within the permissible bounds of fair comment. The Company made neither direct nor indirect threats to close the Walnut Ridge plant and the Board's finding to the contrary is not supported by substantial evidence considered on the record as a whole.

The petition of the Board for enforcement of its order is denied.[3]

3. Because we deny enforcement of the Board's order, we deem it unnecessary to consider the propriety of an evidentiary ruling challenged by the Company. At the outset of the administrative hearing in this case, the Company renewed a motion, previously denied by the General Counsel, requesting that the administrative law judge require the General Counsel to produce all written statements of any witnesses that the General Counsel might call to testify. The motion was denied and this denial was affirmed by the Board with some modifications. The Company contends that this ruling was erroneous and that § 552 of the Freedom of Information Act requires that such information be produced prior to the commencement of a hearing. We note that the applicability of § 552 of the Free-

dom of Information Act to the statements of prospective witnesses in unfair labor proceedings has been the subject of recent litigation and that the courts which have had occasion to face this issue have reached differing conclusions. *Compare Robbins Tire and Rubber Co. v. NLRB*, 563 F.2d 724 (5th Cir. 1977) *with Goodfriend Western Corp. v. Fuchs*, 535 F.2d 145 (1st Cir.) *cert. denied*, 429 U.S. 895, 97 S.Ct. 257, 50 L.Ed.2d 178 (1976), *and Title Guarantee Co. v. NLRB*, 534 F.2d 484 (2d Cir.), *cert. denied*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976). Because of our disposition of the present case, however, we deem it appropriate to reserve consideration of this issue for another day.