NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

TRANSPORTATION MANAGEMENT
CORPORATION, Respondent.

No. 81–1854.

United States Court of Appeals,
First Circuit.

Argued June 4, 1982.

Decided Aug. 13, 1982.

Penny Pilzer, Attorney, with whom William ˙A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and John D. Burgoyne, Asst. Gen. Counsel, Washington, D. C., were on brief for petitioner.

Martin Ames, Chelmsford, Mass., for respondent.

Before CAMPBELL and BREYER, Circuit Judges, and PETTINE,* District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its decision and order finding Transportation Management Corporation ("TMC") in violation of sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("NLRA"). 29 U.S.C. §§ 158(a)(1) and (3). We enforce the Board's order.

The following facts, all supported by substantial evidence, were found by the administrative law judge (ALJ) and adopted by the Board in this case. TMC is a company which provides transportation for handicapped and other special education students between their homes and both public and private schools throughout Massachusetts. Employees of TMC drive the students to and from school in company-owned station wagons, and it is TMC's policy to give their drivers free personal use of the vehicles (except during summer months) when they are not being used to transport students. The station wagons are accordingly garaged at the drivers' homes and may ordinarily be used for personal business.

The TMC drivers are represented by a union—Teamsters Local 829. At a union meeting on April 13, 1980, the drivers voted to strike because of a breakdown in collective bargaining with the company. No date was set for the strike, however, because approval was needed by the international

* Of the District of Rhode Island, sitting by desig-     nation.

before any strike could commence. TMC, concerned about the effect a strike would have on its services,[1] devised an employee poll which it distributed to all of its drivers on April 16–18 through its supervisors and other office personnel. This poll, which assumed incorrectly and without any substantial basis in fact that the strike would begin on April 28th [2] (the first school day after the April 21–27 spring vacation), asked the drivers to sign one of two statements contained on a printed form. The first statement declared:

I shall return to work on April 28th, 1980, and shall work for at least two weeks after that date, regardless of whether or not a strike is called. By so agreeing, TMC will allow me to keep it's [sic] station wagon for my use during the April school vacation. In the event I do not live up to these promises, I agree to pay to TMC as a rental for the station wagon, a sum of $25.00 per day plus 35 cents per mile for the nine days beginning April 19 through April 27, 1980, and for any days thereafter that I do not work and retain possession of the Company's station wagon. I further agree that the payment for this rental of the Company station wagon may be offset and withheld from any wages TMC owes me and I will remain liable for any remaining balance.

The second choice read as follows:

I do not agree both to return to work on April 28, 1980, and to work for at least the next two weeks after that. I shall return the TMC station wagon to TMC's Medford office on April 18, 1980, immediately after the completion of my afternoon run at which time I will receive my weekly paycheck. Failure to return the vehicle at the time and place specified above will result in the same rental charges under the same terms and conditions as outlined in number (1).

TMC supervisors were instructed to give no explanation for the poll when they presented it to employees, but were told simply to say "Just read the form and please fill it out." There was also testimony that supervisors told employees that the keys to their vehicles would be immediately taken away if they did not cooperate in the poll. Employee Pauline Hurley, who refused on principle to sign either available choice, testified that her supervisor told her she was "fired" for her refusal. Another driver, Jean Nelson, signed under the first option but penciled in the words "under duress" next to her signature. She later gave an interview to the local newspaper in which she was quoted as saying that the poll was being used to "stymie" the union's strike effort. In all, roughly 47 employees either refused to sign the poll or signed the second option. By April 23, all of these drivers (plus Ms. Nelson) had had their vehicles taken back by TMC.

On April 22 the company sent the following letter to a number of the employees who had refused to sign under the first statement.

If you desire to return to work Monday, April 28, 1980, please contact Claire Welby at 395–8604 by Friday noon, April 25, 1980. If we do not hear from you, we assume you have no interest in continuing to work for Transportation Management Corporation.

Sincerely yours,
Paul Sullivan
Vice President

Employee Lorraine McCue, who called in reference to this letter and who had refused to sign the poll because she was uncertain about her feelings regarding the strike, was told by TMC's supervisor for safety and personnel, John Clisham, that, despite her willingness to work on April 28, she would not be allowed to pick up her vehicle unless she signed the poll. According to her testi-

1. The company was under a court order to provide its Boston services on a regular basis.

2. In fact, approval for the strike from the international headquarters of the Teamsters was not received by the local until May 19. The compa-

ny based its assumption that the strike would begin on April 28 on "rumors." It never contacted the union or the union's counsel to verify the date, however.

mony, which the ALJ reasonably credited, she was told that her signature on the poll was a "company condition" of obtaining her car—and hence of working for TMC. In all, some 35 employees did not return to work after the spring vacation. The Board held that all of these drivers were "constructively discharged" for reasons related in one way or another to the poll. The Board found both that the poll was coercive in violation of section 8(a)(1)[3] of the NLRA and that the resulting discharges were violative of section 8(a)(3)[4] of the NLRA. The Board accordingly ordered reinstatement with back pay for the affected drivers.

TMC contends that the poll in question was not coercive. It notes that individual responses to a poll found to be coercive in *W. A. Sheaffer Pen Co. v. NLRB*, 486 F.2d 180 (8th Cir. 1973), were placed in each employee's personnel file—an action not shown to have occurred here. But while this may be so, the poll in *Sheaffer* was otherwise less demanding than the present one. In *Sheaffer*, a company facing a potential strike asked prospective replacement employees whether they would "be willing [in the event of a strike] to cross a picket line when entering and leaving the plant." *Id.* at 181 n.2. The court upheld the Board's finding that the poll violated section 8(a)(1) because it "carried with it the inherent implication that the answer given would have affected the applicants' chances of employment." *Id.* at 182.

The TMC poll carried with it a more explicit implication that continued use of the company vehicle (and thus of employment at TMC) depended upon surrender of section 7 rights. The first and obviously preferred option asked employees to promise that they would work for two weeks after April 28 regardless of whether or not a strike was called, thus plainly asking employees to waive their right to strike during this period. Penalties in the form of station wagon rental charges were to be assessed for any failure to live up to these promises. The second option required employees, in effect, to declare April 28 as the strike date regardless of their feelings and intentions on the matter. This was particularly intrusive since there was no substantial basis for believing that the international union would approve a strike by April 28. Most importantly, when TMC supervisors told employees that their signatures on the poll were required as a "condition" of working for the company, employees who were uncertain about the strike were placed in an untenable position. Either they had to presently declare their intention to strike on April 28 and face immediate loss of their vehicle (and perhaps their job), or they were forced to waive their right to strike for two weeks after April 28. This was not a "poll" so much as an employer-induced Hobson's choice insofar as these employees were concerned, and it is scarcely surprising that some refused to answer. In short, not only were no guarantees or explanations for the poll given to assure employees that their rights would be respected, *Struksnes Construction Co.*, 165 NLRB 1062, 1063 (1967), but also actual reprisals were promised and instituted against employees who did not sign. In light of all these factors, we think the Board's conclusion that the poll was coercive and interfered to an improper extent with employee rights was adequately supported.

TMC contends that it was entitled, for planning purposes, to ask for the information requested because of the importance of its business—transporting handicapped children to and from school—and because of the court order mandating that it provide regular service. *See* note 1, *supra*. We think TMC would have been entitled in these circumstances to conduct a purely informational poll designed to reveal how

---

**3.** Section 8(a)(1) declares that employers may not "interfere with, restrain, or coerce employees in the exercise of [their section 7] rights ...." 29 U.S.C. § 158(a)(1). Section 7 protects, among other things, an employee's right to strike or engage in any "concerted activity." 29 U.S.C. § 157.

**4.** Section 8(a)(3) prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

**66**

many employees might or might not be available to help the company carry out its obligations to the children and the court once a strike date was set. The board has apparently approved such polls so long as they adequately explain their limited purpose and give clear assurances that employees' rights under the Act will be fully respected. *Struksnes Construction Co.*, 165 NLRB 1062 (1967) (setting out conditions for employer polls to determine majority status of union). *See also W. A. Sheaffer Pen Co. v. NLRB*, 486 F.2d at 182. In the present case, however, given the absence of any assurances, the wording of the poll, the lack of a firm strike date, and the later statements of TMC's supervisors, we believe the Board could properly find that the company's actions violated section 8(a)(1), notwithstanding TMC's legitimate reasons for wishing to obtain information as to its employees' intentions.

Since we find that the Board's conclusions respecting the TMC poll are supported by substantial evidence, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), we enforce its order in this regard. TMC has not challenged any other aspect of the Board's order.

*The order of the Board is enforced.*