# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-1651
No. 14-1934

_____

Greater Omaha Packing Co., Inc.

*Petitioner/Cross-Respondent*

v.

National Labor Relations Board

*Respondent/Cross-Petitioner*

_____

Petition for Review of an Order
of the National Labor Relations Board

_____

Submitted: February 12, 2015
Filed: June 22, 2015

_____

Before RILEY, Chief Judge, LOKEN and SMITH, Circuit Judges.

_____

LOKEN, Circuit Judge.

The General Counsel of the National Labor Relations Board charged Greater Omaha Packing Co., Inc., with wrongfully terminating three employees for engaging in protected concerted activity, interrogating employees regarding protected concerted activities, and creating the impression it was conducting surveillance of employees' protected concerted activities. After an evidentiary hearing, the Board's

Administrative Law Judge ("ALJ") determined that Jorge Degante Enriguez ("Degante"), Susana Salgado Martinez ("Salgado"), and Carlos Zamora were wrongfully terminated in violation of Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), but found that Greater Omaha had not made coercive statements to Zamora or created the impression that Degante and Salgado's protected activities were under surveillance. Greater Omaha and the General Counsel cross-appealed to the Board, which sustained all charges. Greater Omaha petitions to set aside the Board's Decision and Order; the General Counsel cross-petitions to enforce the Order. We affirm the wrongful termination rulings, decline to uphold the interrogation and surveillance rulings, and enforce the Board's Order, as so modified.

## I. Background

Greater Omaha employs several hundred workers in the fabrication area of its beef processing plant, where meat is processed into cuts as it moves through the area on multiple lines at set speeds. The line employees work in close proximity to each other but cannot see their supervisors' office from the production floor. In 2008, the entire non-union fabrication workforce stopped working until Greater Omaha's owner listened to their concerns. No employees were fired for the 2008 stoppage.

In April 2012, the Department of Homeland Security notified Greater Omaha that the employment eligibility of 179 employees could not be verified. Customs officials arrested some employees and others quit, forcing Greater Omaha to replace dozens of workers. During this process, the remaining employees complained that the speed of the meat lines forced them to assume heavier workloads because there were so many new workers. In mid-April, ten to twelve employees, including Zamora, left their workstations and went to the cafeteria to protest these working conditions. They returned to work when Plant Manager Jose Correa agreed to meet at the end of the day. During that meeting, employees including Zamora expressed concern they were not being paid enough and the meat conveyors were moving too

-2-

fast at current staffing levels. Correa replied that the compensation package including benefits was competitive. He agreed to speak with management about their concerns and reminded employees of the safety rule that they not leave the production lines without permission. Zamora testified that Correa said a pay increase was possible, but he had to speak with Fabrication Manager Eliseo Garcia.

Degante testified that employees remained disgruntled about wages and line speeds after the meeting with Correa and looked to Degante for a solution. In early May, Degante planned a work stoppage for Monday, May 14, with the signal to be the clock striking 10AM. Over the prior weekend, Degante asked Salgado to tell other employees about the stoppage; when she told others on her line, they were already aware of the plan. A friend told Zamora of the planned stoppage before the end of his 9AM break on Monday morning.

Around 9:30AM on May 14, Zamora was summoned to the supervisor's office, where Correa was waiting with Garcia. Zamora testified:

Q  What did Mr. Correa say?

A  He wanted to know what it is that I wanted, that I have a good job, that I have good insurance, that I have good overtime, what else did I want?

Q  Did you respond?

A  I told him that all I wanted was an increase.

Q  What did Mr. Correa say?

A  That I was fired, just to leave my stuff back there because I had left my line twice.

A security guard escorted Zamora from the plant; he did not return to the production floor. Correa and Garcia testified that, during the prior week, Zamora left his line without authorization to speak to Garcia, who warned him not to. At the May 14 meeting, Garcia told Zamora that he needed to get permission before leaving his line. Correa fired Zamora when he responded by calling Garcia and Correa assholes and claimed they were picking on him. Zamora then swore and yelled, "I am going to kill you and your family." Zamora denied swearing, yelling, being disrespectful, or threatening anyone. The security guard who escorted Zamora from the plant testified that he thought Zamora and the supervisors were threatening each other as they exited the office but was unsure because they were speaking Spanish.

Shortly after 9:30AM, Degante's immediate supervisor told him to go to Garcia's office, where Correa and Garcia were waiting. Degante testified that, when he arrived, Garcia accused him of being "the one agitating people." Degante denied "doing anything" but agreed he was not happy with his salary. Garcia said, "Just leave your stuff in here and you can go. You are dismissed." Degante testified that, when he protested that was unfair, Garcia said "that someone had told him that I was the leader of the strike that we were planning to do." Two security guards escorted Degante to his locker and then "to the exit door, where I have my car."

Correa and Garcia again offered a different account of the meeting. Correa testified that Degante was summoned because he was late getting to his line after the morning break. Garcia testified that Degante's tardiness had been a continual problem during Garcia's four and a half years at the plant. When they brought up issues of timeliness and following instructions, Degante refused to acknowledge he had done anything wrong, and Correa fired him for insubordination. Correa testified that, if Degante had acknowledged wrongdoing and said he would change his ways, he would not have been fired. Degante admitted he had been warned in 2012 about taking unauthorized breaks.

At some point later that morning, four supervisors including Correa and Garcia spoke to Salgado in the supervisor's locker room. She had not seen Degante or Zamora after their terminations. Correa told her, "You are here because you are one of the organizers of the strike." Salgado asked who told him that. Correa responded, "In here, there are no witnesses. You didn't take good care of your job. You are fired." Security then escorted her from the plant. Salgado testified she was not informed of any rules she had broken but admitted she sometimes left her work area without permission to use the restroom. Garcia testified that he summoned Salgado because he had seen her on the catwalk that morning. Correa and Garcia testified they informed Salgado she should not leave her workstation without permission. Salgado replied that others left without permission so she could as well. The disagreement continued until Salgado said her supervisors "were not very good employers" and were mistreating her. Correa then fired her for failure to follow instructions. Garcia described Salgado as "a good performer with no previous incidents," but her immediate supervisor testified that Salgado leaving the line without permission was a daily occurrence.

No work stoppage occurred on May 14. Greater Omaha was charged with wrongfully terminating the three employees for engaging in protected concerted activity. The interrogation and surveillance charges arose out of the three termination meetings. The issues at the contested hearing turned in large part on conflicting testimony by the participants in those meetings: Correa, Garcia, and the three terminated employees.

## II. The Employee Terminations

"An employer violates § 8(a)(1) by discharging a non-union employee for organizing or implementing a collective walkout to protest working conditions." JCR Hotel, Inc. v. NLRB, 342 F.3d 837, 840 (8th Cir. 2003). To establish a violation, the General Counsel must prove that this protected activity was a motivating factor in the

discharge, which necessarily requires proof that the employer knew the employee was engaged in protected activity. NLRB v. RELCO Locomotives, Inc., 734 F.3d 764, 780 (8th Cir. 2013). "Because these are fact-intensive issues, we must enforce the Board's order if it is supported by substantial evidence on the record as a whole." JCR Hotel, 342 F.3d at 841. "Put differently, we must decide whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion." Allentown Mack Sales and Serv., Inc. v. NLRB, 522 U.S. 359, 366-67 (1998). Motivation "is a question of fact that may be inferred from both direct and circumstantial evidence." Concepts & Designs, Inc. v. NLRB, 101 F.3d 1243, 1244 (8th Cir. 1996).

In this case, the ALJ resolved conflicts in the testimonies of the terminated employees and supervisors Correa and Garcia about the events on the morning of May 14, 2012. "[A]n ALJ's credibility determinations are considered with the rest of the NLRB's factual findings under the general substantial evidence test derived from Universal Camera Corp. v. NLRB, 340 U.S. 474 [] (1951)." Town & Country Elec., Inc. v. NLRB, 106 F.3d 816, 819 (8th Cir. 1997). "[T]he question of credibility of witnesses is primarily one for determination by the trier of facts, and findings in this area are reversed only in extraordinary circumstances." Chemvet Labs., Inc. v. NLRB, 497 F.2d 445, 449 (8th Cir. 1974) (quotation omitted).

The ALJ found "the discriminatees' account of what transpired on May 14 to be far more credible than that of Correa and Garcia." The ALJ cited several factors that tended to discredit testimony by Correa and Garcia as to why the three employees were terminated: "virtually simultaneous discharge of three employees for ostensibly unrelated reasons"; the implausibility of terminating employees for misconduct Greater Omaha had tolerated for years; the "precipitous discharge" of Salgado, who had a clean disciplinary record; and the sparse explanation for the terminations on the employees' records. The ALJ found it implausible that Degante and Salgado "would simply dig in their heels" when supervisors demanded that they abide by plant rules,

-6-

and that the supervisors would summarily terminate Salgado for violating company policy, rather than giving a warning, as Degante had previously been given.

The ALJ found that Zamora was terminated for engaging in the protected activity of complaining with other employees about the speed of the conveyor chains. The ALJ credited the employees' testimony that there was a planned 10AM work stoppage on May 14 and found that Correa and Garcia knew of the plan. They terminated Degante because they suspected he was behind the planned stoppage and Salgado because she too was suspected of playing a significant role in the plan. The ALJ concluded the stoppage did not occur because the abrupt absence of three leaders of their protected activity likely deterred others from taking action.

Greater Omaha filed exceptions to the ALJ's decision, objecting to many findings of fact, the credibility determinations, the inferences from the facts, the conclusions of law, and the remedy. The Board upheld the wrongful termination rulings. Accepting the ALJ's credibility findings, the Board determined that "the discriminatees previously had engaged in protected activity and the Respondent terminated them because it perceived they would continue to do so."

On appeal, Greater Omaha argues the General Counsel failed to prove that the employees' alleged protected activity was a motivating factor in their terminations. There is no substantial evidence that Greater Omaha had knowledge of the protected activity, Greater Omaha contends, and therefore the record does not support the inferences of wrongful motive drawn by the ALJ and by the Board. In support of this contention, Greater Omaha emphasizes that no witness testified that any supervisor was told about the planned work stoppage, the involved supervisors testified they had no knowledge of any alleged stoppage, and no stoppage in fact occurred on May 14.

The Board responds: (i) the General Counsel was not required to prove how Greater Omaha's supervisors learned of the planned work stoppage for the record to

permit the ALJ and the Board to reasonably infer that Greater Omaha knew of the protected activity; (ii) there was direct evidence of employer knowledge because the supervisors knew of Zamora's participation in similar protected activity in April and accused Degante and Salgado of planning a work stoppage on May 14; and (iii) the suspicious timing and pretextual reasons given for the abrupt firing of three suspected protected activity leaders supported the inference drawn by the ALJ and the Board that the protected activity was a motivating factor in the discharges.

We agree with the Board that substantial evidence clearly supports its conclusion that Greater Omaha violated Section 8(a)(1) in terminating the three employees. All three terminated employees testified to the planned work stoppage, and two testified that Correa and Garcia accused them of organizing the concerted activity in the termination meetings. Greater Omaha urges us to discredit this "uncorroborated self-serving testimony." But all testimony relating to what was said at those meetings came from interested witnesses whose testimony would typically be denigrated by opposing lawyers as "self-serving." "When the Board is faced with conflicting testimony, it is the sole prerogative of the ALJ to make credibility findings," and it is our more limited task to assess "whether substantial evidence, on the record as a whole, supports the Board's findings." DeQueen Gen. Hosp. v. NLRB, 744 F.2d 612, 617 (8th Cir. 1984). Here, there are no "extraordinary circumstances" causing us to question the ALJ's well-supported credibility findings.

Crediting the employees' testimony, there was substantial direct and circumstantial evidence that Greater Omaha's knowledge of the protected activity in April and its planned continuation on the morning of May 14 was a motivating factor in the precipitous terminations of Zamora, Degante, and Salgado that morning. That no work stoppage occurred on May 14 is nearly irrelevant. Section 8(a)(1) prohibits an employer "from discharging an employee for conduct the employer believes to be protected concerted activity . . . . even if the employer misjudged what the fired employee had done." JCR Hotel, 342 F.3d at 841. Moreover, the ALJ and the Board

-8-

reasonably inferred that the abrupt discharge of three plan leaders may well have persuaded other employees to scuttle the plan. We deny the petition to review and grant the petition to enforce this portion of the Board's Order.

## III. Coercion and Interrogation

The ALJ concluded "that the General Counsel did not prove illegal interrogations and/or surveillance as alleged in paragraph 4 of the complaint." The Board sustained the General Counsel's appeal of these rulings and modified its Decision and Order accordingly. The Board found that Correa's statements to Zamora may not have been interrogation but were nonetheless coercive. Board Member Johnson in concurring "emphasize[d] the need to afford employers the legitimate opportunity to exchange views with employees on terms and conditions of employment." The Board further found that statements to Degante and Salgado created the impression of wrongful surveillance: "Garcia told Degante that 'someone' had told him that Degante was the leader of the planned work stoppage, and Correa accused Salgado of organizing the work stoppage." Member Johnson dissented from this ruling, finding "insufficient basis to find that Degante and Salgado would reasonably infer from Correa and Garcia's statements that knowledge or suspicion of their role in the protected activity resulted from management surveillance." Greater Omaha petitions for review of both rulings.

### A. Coercion

Section 8(a)(1) prohibits an employer from "coerc[ing] employees in the exercise of the[ir] rights." However, Section 8(c) explicitly recognizes that not all displeased communications from an employer to an employee are coercive: "The expressing of any views, argument, or opinion . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). Accordingly, to violate Section 8(a)(1),

-9-

a statement must contain a threat of reprisal or force or promise of benefit. See NLRB v. Hart Beverage Co., 445 F.2d 415, 420 (8th Cir. 1971). "Questioning which does not coerce or restrain employees in their right to [engage in protected activity] is permissible." NLRB v. Douglas Div., Scott & Fetzer Co., 570 F.2d 742, 745 (8th Cir. 1978).

The Board found that supervisor Correa asking Zamora, "what it is that [Zamora] wanted," stating that Zamora had a good job, and then repeating the inquiry, while perhaps not interrogation, "were nonetheless coercive, as they conveyed displeasure with Zamora's protected activity." But the relevant question is not whether management expressed displeasure, but whether the statements reasonably tended to coerce the employee not to exercise his right to engage in concerted activity. The only coercion articulated by the Board was that the statements were made just before the planned work stoppage "and were immediately followed by Zamora's termination for engaging in protected conduct." But Zamora was not being coerced, he was being fired. And other employees were not coerced by this statement, as Zamora was summarily escorted from the plant without an opportunity to relate management's displeasure to his coworkers.

In these circumstances, the termination was coercive, but the brief statements preceding termination were not. We agree with Board Member Johnson that employers must be permitted a reasonable opportunity to exchange views with unrepresented employees about their collective concerns with the terms and conditions of their employment. Here, Correa's question, "What do you want," was exactly such an inquiry. If Zamora had responded, "We need to talk about line speeds," rather than, "I want more money," perhaps management's response would have been different than summary discharge. The point is that unless the statement itself coerces an employee not to exercise his rights, it is protected by Section 8(c)

-10-

and is not a violation of Section 8(a)(1).[1]  The Board's Order was contrary to this essential statutory principle.  We therefore decline to enforce paragraph 2(b) of the Amended Conclusions of Law and paragraph 1(b) of the cease and desist Order.

## B. Impression of Surveillance

We have in numerous cases upheld Board determinations that an employer violated Section 8(a)(1) by "keeping its employees' union activities under surveillance. . . . Such conduct is violative of Section 8(a)(1) as it could inhibit the right of employees to pursue their union activities untrammeled by the fear of possible employer economic coercion or other forms of retaliation."  NLRB v. Ralph Printing & Lithographing Co., 379 F.2d 687, 691 (8th Cir. 1967) (maintaining list of union adherents); see Miss. Transp., Inc. v. NLRB, 33 F.3d 972, 978 (8th Cir. 1994) (monitoring union activities).  However, "absent a tendency to coerce, surveillance or creating the impression of surveillance does not constitute a § 8(a)(1) violation."  Belcher Towing Co. v. NLRB, 726 F.2d 705, 708 (11th Cir. 1984).  Indeed, the employer's right to non-coercively gather information, even about union activities, is protected by Section 8(c).  See Douglas Div., 570 F.2d at 745-46 (enforcement denied because "casual and sporadic" questions about union organizing campaign were not coercive); Bridgestone Firestone S.C., 350 N.L.R.B. 526, 527 (2007).

---

[1]In April 2012, Zamora was a vocal participant in a work stoppage (for which he was not disciplined).  Correa told the involved employees that Greater Omaha's salaries were competitive taking employee benefits into account.  Correa's question at the start of his May 14 meeting with Zamora, and Zamora's response, were consistent with a continuation of that lawful April discussion. By contrast, the cases on which the Board relies all involved statements made to discourage employees from supporting or voting for a union, and the employers used words conveying a clear threat of reprisal.  See, e.g., NLRB v. Intertherm, Inc., 596 F.2d 267, 273-76 (8th Cir. 1979); NLRB v. Crystal Tire Co., 410 F.2d 916, 918 (8th Cir. 1969).

In recent cases involving employer surveillance of union activities, the Board has seemed to ignore this critical coercion element:

> The Board's test for determining whether an employer has created an unlawful impression of surveillance is whether, under all of the relevant circumstances, reasonable employees would assume from the statement in question that their union or protected activities had been placed under surveillance.

McClain & Co., Inc., 358 N.L.R.B. No. 118, at *5 (Aug. 31, 2012) (quotation omitted). In addition, while adhering to the distinction that it is only employer surveillance that is unlawful, not obtaining information volunteered by other employees, the Board has reduced this issue to a single inquiry:

> [W]hen an employer tells employees that it is aware of their union activities, but fails to tell them the source of that information, it violates Section 8(a)(1) because employees are left to speculate as to how the employer obtained the information, causing them reasonably to conclude that the information was obtained through *employer* monitoring.

Id. (quotation omitted). Again the essential element of coercion is entirely missing from this articulation of the statutory standard. Most, indeed virtually all employer surveillance cases have involved union organizing or election campaigns, with the surveillance issue typically surrounded by the employer's other anti-union unfair labor practices. In that context, the absence of an explicit finding of coercion is not surprising, because it is often reasonable to infer that the employer's monitoring of union activities or adherents was done for precisely that reason. For example, in Mississippi Transport, the employer told an employee "there was word going around that I had sent in a union card" minutes after wrongfully terminating another employee for his pro-union activities. 33 F.3d at 977-79. But when the Board does not explicitly find the requisite coercion, and it is not apparent to the reviewing court

from the record, a creating-the-impression-of-surveillance order should not be enforced.

Here, the Board applied the above quoted standard from <u>McClain</u> in finding that Greater Omaha impermissibly created the impression of surveillance in its termination meetings with Degante and Salgado. This is not the typical case where an employer gathers information about ongoing union activities. Rather, the Board found unlawful surveillance of the protected activities of non-union employees who were acting in concert to protest their working conditions. The Board has cited and our research has uncovered only one such prior case, <u>Sams Club, a Div. of Wal-Mart Corp.</u>, 342 N.L.R.B. 620, 620-21 (2004). We do not doubt that employer surveillance of this type of protected activity can violate Section 8(a)(1) if the necessary element of coercion is proved. But it is far less likely in this situation that the employer's statement was intended to be, or was perceived as being, coercive. Therefore, more careful analysis of the coercion element is required than in the <u>McClain</u> standard.

The Board found that the statements accusing Degante and Salgado of being leaders of the stoppage impermissibly created the impression of surveillance. But the Board did not explain how those statements could have coerced or restrained the employees from engaging in their protected activity, the planned work stoppage. In assessing Section 8(a)(1) claims, we must consider the entire factual context. Widespread employee communication of the plan before May 14 made it unlikely that Degante, Salgado, or others would assume Greater Omaha learned of the plan through employer surveillance. The statements did not create fear of reprisal or inhibit protected activity by Degante and Salgado, as they were immediately terminated -- independent Section 8(a)(1) violations that are being remedied -- and were prevented from communicating with other employees.[2] The statements were not made known

---

[2]Correa had no reason to respond when Salgado asked who told him she was an organizer because she was being terminated. The Board's emphasis on his failure

-13-

to the rest of the workforce, so the likelihood they would be perceived as coercive is hard to fathom. The protected activity on May 14 was a work stoppage that would immediately reveal all employee participants to Greater Omaha. In these circumstances, like Dissenting Board Member Johnson, we conclude the ALJ properly found that the statements to Degante and Salgado just before they were wrongfully terminated did not constitute distinct illegal surveillance violations of Section 8(a)(1). Accordingly, we decline to enforce paragraph 2(c) of the Amended Conclusions of Law and paragraph 1(c) of the cease and desist Order.

## IV. An Additional Remedy Issue

Sustaining the General Counsel's appeal of a third issue, the Board ordered that, in reinstating the wrongfully terminated employees with backpay, Greater Omaha must reimburse them "an amount equal to the difference in taxes owed upon receipt of a lump-sum backpay payment and taxes that would have been owed had there been no discrimination against them" and "[s]ubmit the appropriate documentation to the Social Security Administration so that when backpay is paid . . . it will be allocated to the appropriate periods." Greater Omaha argues that these new remedies are invalid because the case in which the Board initially adopted them was decided by a panel that lacked a quorum because two members were invalid recess appointments. See Noel Canning v. NLRB, 705 F.3d 490 (D.C. Cir. 2013), aff'd, 134 S. Ct. 2550 (2014).

This contention is without merit. The current Board regained a full quorum of five Senate-confirmed members in August 2013 and has since reaffirmed and explained its new remedial policy. See Don Chavas, LLC, 361 N.L.R.B. No. 10, at *3-6 (Aug. 8, 2014). The panel that ordered the remedies in this case was properly constituted and exercised the Board's "broad discretion to fashion appropriate

to respond was illogical.

-14-

[backpay] remedies once an unfair labor practice is established." <u>NLRB v. J.S. Alberici Const. Co.</u>, 591 F.2d 463, 468 (8th Cir. 1979).

As Greater Omaha does not attack the merits of applying the new remedies in this case, they must be enforced. We need not consider whether the Board's apparent adoption of a rigid policy imposing these requirements in every case where backpay is ordered might in some cases impose a burden so unreasonable or unnecessary that it abuses the discretion "given it by Congress to attain just results in diverse, complicated situations." <u>Phelps Dodge Corp. v. NLRB</u>, 313 U.S. 177, 198 (1941).

## IV. Conclusion

For the foregoing reasons, we grant enforcement of the Board's Decision and Order except as to paragraphs 2(b) and 2(c) of the Amended Conclusions of Law and paragraphs 1(b) and 1(c) of the Order.

_____