FOURTH DIVISION

May 26, 2005

No. 1-04-1523

CHICAGO TRANSIT AUTHORITY, ) Appeal from an Order

) of the Illinois Labor 

Petitioner-Appellant, ) Relations Board, Local Panel.

) 

) 

v. ) 

) 

ILLINOIS LABOR RELATIONS BOARD, ) ILRB Nos.   L-CB-01-038

LOCAL PANEL, and AMALGAMATED ) L-CA-02--003 TRANSIT UNION LOCAL 241, ) L-CA-02-004 )    

Respondents-Appellees. )     

JUSTICE THEIS delivered the opinion of the court:

Petitioner, the Chicago Transit Authority (CTA), appeals from a decision of the Illinois State Labor Relations Board, Local Panel (the Board), finding that Amalgamated Transit Union Local 241 (the Union) did not fail to bargain in good faith in violation of section 10(b)(4) of the Illinois Public Labor Relations Act (the Act) (5 ILCS 315/10(b)(4) (West 2000)), when it took actions in furtherance of a strike.   The CTA also appeals from the Board’s finding that it engaged in unfair labor practices under section 10(a)(1) of the Act (5 ILCS 315/10(a)(1) (West 2000)), by interfering with its employees’ rights to engage in the protected concerted activities of participating in a strike authorization vote, distributing flyers to the public, and conducting a rerun election on CTA property. 

The CTA contends that (1) the Board erred in finding that the Union did not violate section 10(b)(4) of the Act because it took actions in furtherance of an unlawful strike, repudiated the parties’ collective bargaining agreement, violated the Act, and thus, failed to bargain in good faith; and (2) the Board erred in finding that the CTA violated section 10(a)(1) when it threatened employees with discharge and disciplinary action because the employees were not engaged in protected concerted activities.  For all of the following reasons, we vacate the Board’s order and remand the matter to the Board for further proceedings consistent with this opinion.

BACKGROUND

The Collective Bargaining Agreement

In January 1996, the CTA and the Union entered into a collective bargaining agreement (the 1996 Agreement).  The 1996 Agreement was effective until December 31, 1999, “and from year to year thereafter,” subject to each party’s right to seek modifications and/or additions as provided for in section 19.2 as follows:

“19.2 
CHANGES
 Either of the parties hereto shall have the right to open this Agreement for modifications and/or additions to be effective January 1, 2000, or any anniversary date thereafter by written notice to the other party sixty (60) days prior to such anniversary date.  Notification submitted in accordance with the foregoing shall contain a written statement of all modifications and/or additions to the Agreement which are proposed.  If no agreement is reached within said sixty (60) days, or such further time as both parties may agree upon, the matter shall be submitted to arbitration as provided in Article 17.  All conditions of this Agreement are to continue in full force and effect until changed, revised or amended from time to time by agreement of the parties or by the decision of the Board of Arbitration.” 

Section 17 of the 1996 Agreement provided as follows:

“17.1 
AGREEMENT TO ARBITRATE
   It is hereby agreed that the properly accredited officers of the [CTA] shall meet and treat with the properly accredited officers of [the Union] on all questions and grievances that may arise during the life of this Agreement, and should there be any that cannot be amicably adjusted between the [parties], same shall be submitted to [arbitration].”

In January 2000, the parties gave the requisite notice and began negotiating the terms of a successor collective bargaining agreement.  By the spring of 2001, Wanda Black, president of the Union, believed that the parties had reached a new tentative agreement.  However, the CTA disagreed with that assertion, leading Black to conclude that the CTA had “reneged” on the new agreement.  On May 21, 2001, the Union filed an unfair labor practice charge against the CTA for unlawfully refusing to recognize the existence of a new collective bargaining agreement, for failing to execute the tentative agreement, and for unlawfully changing the terms of the new agreement.  

The Board issued a complaint for hearing on those charges.  However, that complaint was not consolidated with the charges at issue in this appeal and neither the administrative law judge (ALJ) nor the Board ultimately considered the merits of those issues.  Rather, the record reflects that sometime after June 26, 2001, the parties began arbitration proceedings over the terms of a successor collective bargaining agreement.  The Union initially objected, but ultimately stipulated to the jurisdiction of the arbitrators to issue an arbitration award as more fully set forth below.

Strike Authorization Vote

In June 2001, the Union was preparing for an upcoming delegate election which was scheduled to occur on CTA property.  After receiving permission from the CTA to use its property to hold the election, the Union decided on the eve of the election to add a strike authorization vote to the ballot.  On June 26, 2001, the employees voted to authorize an unfair labor practice strike and the Union posted the results at all work locations.  However, the Union never gave the CTA notice of its intent to strike and no strike by CTA employees ever occurred. 

On June 27, 2001, the CTA filed an unfair labor practice charge against the Union.  Therein, it alleged that a strike was prohibited by the 1996 Agreement and section 17 of the Act, and therefore, the Union’s strike authorization vote violated section 10(b)(4) of the Act, which makes it an unfair labor practice “to refuse to bargain collectively in good faith with a public employer.”  5 ILCS 315/10(b)(4) (West 2000). 

The CTA’s Actions Following the Vote

Shortly after the election and strike authorization vote, the Union requested that the CTA allow it to conduct a rerun election on CTA property due to a balloting error at one of the election sites.  Robert Geirut, CTA vice-president of employee relations, sent the Union a letter stating that, in view of its unauthorized ballot proposition, which included a vote to authorize an illegal unfair labor practice strike, it was denying the Union’s request to conduct the election on its property.

Additionally, after the strike authorization vote, the Union notified the public of its labor dispute with the CTA by distributing a flyer and requesting the support of the public.  The flyer stated in part: 

“While we recognize that the riding public relies on CTA for its livelihood, we also rely on the CTA for our livelihood.  While 
we do not want to disrupt the transportation system in the City of Chicago
, we may have to should the CTA continues [
sic
] to not respect and stand behind their [
sic
] agreement with us.” (Emphasis in original.)

Black distributed the flyers to CTA bus operators with instructions to pass them out to the public, but not to distribute them on CTA property or in uniform.  The flyers were distributed to the public per Black’s instructions at bus stops and street corners.  There was no testimony at the hearing before the ALJ that the flyers were being distributed on CTA buses or on CTA property.

Black testified that at the time the flyer was passed out to the public, it was the intent of the Union to have the public believe that the transit system would be shut down or impaired and that would help the Union in negotiations with the CTA.    

In response to the flyers, the CTA sent Black a letter stating that the flyers were appearing on CTA vehicles, that these documents were not authorized or approved by the CTA, and therefore, that their distribution was strictly prohibited as per the CTA general rule book governing all employees.  The letter cited the CTA’s no-solicitation rule and indicated that, “[A]ny employee who participates in the distribution of these notices is subject to disciplinary action up to and including discharge for engaging in this activity.”  In addition, the letter focused on the Union’s reference to disrupting the transportation system in the City of Chicago, and considered the statement an illegal strike threat to coerce the CTA to accept the terms proposed by the Union in contract negotiations.  Therefore, the CTA insisted that the Union repudiate the documents and inform Union members that the distribution of these notices was strictly prohibited.  The letter ended by stating that, “[A]ny employee who does participate in the distribution of this document will be subject to disciplinary action up to and including discharge.”  The CTA issued its memo to CTA employees, but did not discipline any employee for distributing the flyer.

Thereafter, on July 2, 2001, Frank Kruesi, the president of the CTA, sent a letter to all CTA employees stating that there was a rumor that some Union members were threatening an illegal strike.  The letter further reiterated the CTA’s position that the Union declined to reach an agreement, that the parties were at an impasse, and that the current 1996 Agreement required them to pursue interest arbitration.  The letter then stated as follows:

“What is not allowed under our agreement, and is also prohibited by the [Act], is threatening illegal strikes and putting jobs at risk.  But that is what some representatives of [the Union] have threatened to do.  Make no mistake about it.  An illegal job action will put jobs at risk.”

In closing, Kruesi stated that, “[i]f there are illegal job actions, we will take whatever legal and disciplinary measures are called for.” 

Thereafter, the Union filed two unfair labor practice charges against the CTA.  Therein, it alleged that the CTA’s communications of June 28 and July 2, 2001, threatened to discipline employees for engaging in protected concerted activities and, therefore, violated section 10(a)(1) of the Act, which makes it an unfair labor practice to “interfere with, restrain, or coerce public employees in the exercise of rights guaranteed in [the] Act.”  5 ILCS 315/10(a)(1) (West 2000).  Additionally, the Union alleged that the CTA violated section 10(a)(1) by refusing to allow the Union to conduct its rerun election on CTA property in retaliation for the Union having engaged in the protected concerted activity of a strike authorization vote.

Interest Arbitration Proceedings

The record reflects that simultaneous to the unfair labor practice charges, the parties began interest arbitration proceedings over the terms of a successor collective bargaining agreement.  Hearings commenced on March 19, 2002.  The Union argued that the arbitration board lacked jurisdiction to address the dispute as to whether the parties had reached a new agreement and requested that the arbitration board defer the award until completion of the unfair labor practice proceedings.  That request was denied and a preliminary award was issued by the arbitrator on October 2, 2002.  Thereafter, the record reflects that on October 24, 2002, the Union filed a complaint in the circuit court for a declaratory judgment and to vacate the award.  On March 27, 2003, the circuit court dismissed the lawsuit with prejudice and denied the Union’s motion to reconsider on June 3, 2003.  Therein, the circuit court ruled that the arbitrator was fully within his authority to decide the issue of whether the dispute was arbitrable.  The Union appealed the decision of the circuit court, but that appeal was ultimately withdrawn.  

ALJ’s Recommended Decision

The unfair labor practice charges brought by the CTA against the Union and the subsequent charges brought by the Union against the CTA were consolidated.  After a hearing, the ALJ issued a recommended decision and order on May 15, 2003.  With respect to the CTA’s allegations, the ALJ dismissed its contentions that the Union violated section 10(b)(4) of the Act when it engaged in the strike authorization vote.  The ALJ found in pertinent part that (1) whether the Union could meet the requirements for a lawful strike under section 17 of the Act had no bearing on the CTA’s allegation that it engaged in an unfair labor practice because the Act does not provide that an unlawful strike is an unfair labor practice; and (2) section 19.2 of the 1996 Agreement did not require that the parties arbitrate a dispute over whether they had reached a tentative agreement in the spring of 2001, and therefore, section 19.2 had no bearing on whether the Union undertook a lawful strike authorization vote.    

With respect to the Union’s allegations, the ALJ found that the CTA violated section 10(a)(1) of the Act when it threatened employees and denied the Union access to its property in retaliation for the strike authorization vote because the Union was engaged in protected concerted activity.  However, the ALJ dismissed the Union’s allegation that the CTA violated section 10(a)(1) when it issued the memorandum to employees warning of discipline if they engaged in illegal job action. 

Thereafter, the CTA filed exceptions to the recommended decision.  Therein, it reiterated its argument that the Union was prohibited from striking due to the terms and conditions of the then-existing 1996 Agreement and section 17 of the Act and that, therefore, any action in furtherance of an unlawful strike amounted to a failure to bargain in good faith and was not protected concerted activity.

Interest Arbitration Award

  On November 20, 2003, in the interim period between the ALJ’s recommended decision and the Board’s order,  the arbitrators entered their interest arbitration decision and award setting forth a successor collective bargaining agreement.  Both parties stipulated to the jurisdiction of the arbitrators to issue that opinion and award.  Thereafter, the CTA filed a motion with the Board to supplement the record with the interest arbitration award as relevant to the matters in the case before the Board.  The Union objected, but the record before this court does not indicate whether the CTA’s motion was granted or denied.

Board’s Final Decision and Order

On April 30, 2004, after hearing oral argument and considering the record, exceptions, and the briefs filed by the parties, the Board affirmed the ALJ’s determination that the Union did not violate section 10(b)(4) of the Act as alleged by the CTA.  In its holding, the Board rejected the CTA’s premise that CTA employees did not have the legal right to strike.  The Board stated that “Section 17 makes clear that CTA employees possess the right to strike.”  While the Board recognized that section 17 establishes certain prerequisites to a lawful strike, it listed only four of the five prerequisites, failing to list the requirement that the parties must not have agreed to submit the disputed issues to arbitration.  

Instead, the Board focused on the fact that “There is no evidence that any strike ever occurred in this matter.  We are therefore unable to determine whether a strike that never happened complied with Section 17's prerequisites.”  The Board further stated that CTA employees “clearly possess the right to strike and a strike authorization vote is not illegal.”  Furthermore, “as no strike ever occurred in this case, we fail to see how any of the parties’ agreement could have been repudiated.”  

Additionally, the Board affirmed the ALJ’s findings that the CTA engaged in conduct that violated section 10(a)(1) of the Act, finding that a strike or any strike-related activity was “clearly protected under the Act.”  As a result, the Board found that the CTA’s various actions constituted unlawful interference, restraint and coercion of public employees in the exercise of the rights guaranteed in the Act.  The Board also found, contrary to the ALJ, that the CTA violated section 10(a)(1) of the Act when it issued the memorandum that warned of discipline if employees engaged in “illegal job action.”  The CTA filed a timely appeal.

ANALYSIS

In rejecting the CTA’s premise that the CTA employees were prohibited from striking, the Board failed to acknowledge all of the prerequisites for a lawful strike by public employees.  Pursuant to section 17 of the Act, there are five requirements that must be met for a lawful strike in the public sector in Illinois: (1) the employees must be represented by an exclusive bargaining representative; (2) the existing collective bargaining agreement, if any, must have expired, or such collective bargaining agreement must not prohibit the strike; (3) the parties must not have agreed to submit the disputed issues to final and binding arbitration; (4) there must have been prior resort to mediation; and (5) the union must have given at least five days’ notice of its intent to strike.  5 ILCS 315/17 (West 2000).  In its decision, the Board omitted any reference to the requirement under the Act that the parties must not have agreed “to submit their disputed issues to final and binding arbitration” in order to lawfully strike.  

This omission becomes particularly significant if the parties had a collective bargaining agreement evidencing that they chose arbitration as the forum to settle their disputes.  The 1996 Agreement indicates under section 19.2 that the parties may elect to propose changes and/or modifications to the collective bargaining agreement.  If no agreement is reached within 60 days of a notice of proposed modifications and/or additions or within such further time as both parties agree, the matter shall be submitted to arbitration as provided in Article 17.  Section 17.1 requires arbitration of “
all
 
questions
 and grievances that may arise during the life of this Agreement.”  (Emphasis added.)  Section 19.2 further provides that the 1996 Agreement shall remain in full force and effect until changed, revised or amended by agreement or by a decision of the board of arbitration.  Thus, if the 1996 Agreement remained applicable at the time of the strike authorization vote, then there is a question whether the parties agreed to submit their disputed issues to final and binding arbitration.  Indeed, the record reflects that the parties ultimately participated in arbitration prior to the Board rendering its decision in this case.  

Thus, where the Board omitted any reference to section 17(a)(3) of the Act, we must vacate the Board’s order and remand for reconsideration of the following issues.  The Board must address whether the parties “agreed to submit the disputed issues to final and binding arbitration.”  5 ILCS 315/17(a)(3) (West 2000).  If the parties were subject to arbitration, then it follows that the Board must consider whether section 17(a)(3) could have been satisfied and, therefore, whether a strike by CTA employees at the time of their dispute would have been prohibited under the Act.  If the Board finds that it would have been unlawful for CTA employees to strike under section 17 of the Act, then the Board must consider whether the Union’s activities in furtherance of an illegal strike violated the Union’s duty to bargain in good faith under section 10(b)(4) of the Act. 

Additionally, if a strike would have been unlawful, the Board must also consider whether the Union’s actions taken in furtherance of an illegal strike under the Act constituted protected activity.  To establish a 
violation of section 10(a)(1) of the Act, the Union must first establish 
 that it was engaged in “the exercise of the rights guaranteed in this Act.”  5 ILCS 315/10(a)(1) (West 2000).  The Board did not address whether actions taken in furtherance of a strike by public employees who are statutorily prohibited from striking would be exercising rights guaranteed by the Act.  Accordingly, for all of the foregoing reasons, we vacate the Board’s order and remand the matter to the Board to reconsider its findings in light of section 17(a)(3) of the Act. 

Vacated and remanded. 

REID, P.J., and QUINN, J., concur.  

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

_________________________________________________________________

CHICAGO TRANSIT AUTHORITY,

 
 

Plaintiff-Appellant, 

v.

ILLINOIS LABOR RELATIONS BOARD, LOCAL PANEL and AMALGAMATED TRANSIT UNION LOCAL 241,

Respondents-Appellees.

________________________________________________________________

 
No. 1-04-1523

 Appellate Court of Illinois

First District, 
Fourth Division

Filed: May 26, 2005

_________________________________________________________________

JUSTICE THEIS delivered the opinion of the court.

Reid, P.J., and Quinn, J., concur.

_________________________________________________________________

Appeal from an Order of the Illinois Labor Relations Board, Local Panel

_______________________________________________________________
__

For APPELLANT James P. Daley

David M. Novak 

Bell, Boyd & Lloyd LLC

Three First National Plaza

70 W. Madison St., Suite 3100

Chicago, IL 60602

Joseph J. Stevens

Schuyler, Roche & Zwirner

One Prudential Plaza

130 E. Randolph St., Suite 3800

Chicago, IL 60601

For APPELLEE Lisa B. Moss

Noah Scott Warman 

Carmell Charone Widmer Mathews and Moss

230 W. Monroe St., Suite 1900

Chicago, IL 60606

Lisa Madigan, Attorney General

Gary Feinerman, Solicitor General

Richard S. Huszagh

100 W. Randolph St., 12
th
 Floor

Chicago, IL 60601