FOURTH DIVISION

No. 1-07-2269

| | | |
|---|---|---|
| CHICAGO TRANSIT AUTHORITY, | ) | Appeal from the |
| | ) | Illinois Labor Relations |
| Petitioner-Appellant, | ) | Board |
| | ) | |
| v. | ) | |
| | ) | |
| ILLINOIS LABOR RELATIONS BOARD and | ) | Nos. L-CB-01-038; L-CA- |
| AMALGAMATED TRANSIT UNION LOCAL 241, | ) | 02-003; and L-CA-02-004 |
| | ) | |
| Respondents-Appellees. | ) | . |

JUSTICE GALLAGHER delivered the opinion of the court.

We revisit this case following remand, and again we are asked to determine whether the parties engaged in an unfair labor practice by failing to bargain in good faith as required by the Illinois Public Labor Relations Act (Act) (5 ILCS 315/1 *et seq.* (West 2000)). Petitioner Chicago Transit Authority (CTA) appeals the Illinois Labor Relations Board's (Board) decision finding that the Amalgamated Transit Union Local 241's (Union) actions of arranging a strike authorization vote during the negotiation of a collective bargaining agreement with the CTA did not amount to an unfair labor practice while finding that the CTA's actions during the negotiations did amount to an unfair labor practice. The CTA first contends on appeal that this cause must be reversed because the Board failed to follow this court's directives on remand. The CTA also claims on appeal that the Board erred in concluding that the Union's organization of a

strike authorization vote, posting the voting results and distributing handbills to the public did not amount to an unfair labor practice pursuant to section 10(b)(4) of the Act (5 ILCS 315/10(b)(4) (West 2000)). The CTA further claims that the Board erred in finding that the CTA committed an unfair labor practice under section 10(a)(1) of the Act (5 ILCS 315/10(a)(1) (West 2000)), when it notified employees that it intended to discipline employees who violated the company's "no-solicitation" rule and engaged in illegal strike activities. The CTA's last claim is that the Board erred in finding that the CTA's denial of the Union's request to use the CTA's premises to rerun an election was based on a retaliation motive resulting from the Union conducting the strike authorization vote. For the reasons stated below, we affirm.

## I. BACKGROUND

This court's May 26, 2005, opinion sets forth a complete recitation of facts for the instant appeal, but for purposes of this appeal, we offer an abridged version of the pertinent facts. See *Chicago Transit Authority v. Illinois Labor Relations Board Local Panel*, 358 Ill. App. 3d 83, 830 N.E.2d 630 (2005).

In January 1996, the CTA and Union entered into a collective bargaining agreement (Agreement). The Agreement was effective from January 1, 1996, through December 31, 1999, and "from year to year thereafter," subject to each party's right to seek modifications and/or additions. In 2000, the Union and CTA began negotiations for a new successive collective bargaining agreement. The Union's president, Wanda Black, thought that a tentative agreement was reached on May 23, 2001, but the CTA disagreed leading Black to conclude that the CTA reneged on the tentative agreement. The Union did not request mediation and took the position that since an agreement between the parties existed, it would not agree to interest arbitration.

On May 23, 2001, the CTA's president, Frank Kruesi, sent Black a letter stating that he was aware of the Union's executive board's decision to seek a strike authorization vote from its members and that Black informed the public about the vote. Kruesi's letter continued by stating that: (1) the CTA's position was that a strike or a threatened strike was a breach of the Agreement; (2) the threatened strike failed to meet all of the explicit requirements for a lawful strike under the Act; and (3) the CTA employees, being essential service employees within the meaning of the Act, were prohibited from engaging in a strike. Black responded to Kruesi in a letter dated May 24, 2001, assuring Kruesi that the Union would comply with its legal obligations. Black's letter did not formally notify the CTA that the Union's employees intended to strike.

For approximately 25 years prior to June 2001, the CTA permitted the Union to conduct elections on CTA property. The procedure followed by the Union to use the property was to send the CTA a written request for permission to conduct an election on its property including the election date and polling hours. The CTA customarily allowed the Union to use its property. On June 5, 2001, the Union sent the CTA a request to use the CTA's property to conduct an election on June 26, 2001, between the hours of 7 a.m. and 8 p.m. During this election, the employees were to select two delegates to attend the Union's upcoming convention. The Union's letter did not indicate that the election would include a ballot item to authorize the Union to call an unfair labor strike nor was the Union anticipating to include such an item on the ballot as of the June 5, 2001, letter.

On June 14, 2001, the CTA sent the Union a letter providing permission for the Union to use the CTA's premise to conduct the election. Approximately one week prior to the scheduled June 26, 2001, election, the Union contacted the Department of Labor Representative (DOL) to

inquire whether a strike authorization vote could be included on the June 26, 2001, ballot. The DOL orally authorized the Union to include the strike authorization vote on the ballot, and on the eve of the scheduled election the Union changed the ballot to include the strike authorization vote. The employees and CTA were not aware ahead of the election of the strike authorization vote's inclusion on the ballot. At the end of the election, the Union determined that a rerun election was necessary at the Chicago Avenue garage site because the employees there were not presented with the option of voting for two conference delegates.

On June 26, 2001, the CTA sent the Union a letter informing the Union that due to the Union's rejection of a tentative collective bargaining agreement on June 14, 2001, and by conducting an illegal strike authorization vote, the parties were at an impasse and should proceed immediately to interest arbitration. The CTA also sent the Union the following letter on June 26, 2001:

"It has been brought to my attention that Local 241 is conducting a special election on Chicago Transit Authority ('CTA') property to authorize an 'unfair labor practice strike in an effort to end its contract dispute with the Chicago Transit Authority' under the guise of an Amalgamated Transit Union Local 241 delegates election. This conduct on the part of Local 241 is illegal and in violation of representations made to CTA representatives as to the purpose of the special election. This conduct among other violations is an Unfair Labor Practice which the CTA intends to pursue with the Illinois Labor Relations Board.

4

> The CTA has advised you in the past regarding illegal
>
> strike threats to coerce the CTA to accept the terms proposed by
>
> Local 241 in contract negotiations."

The CTA further claimed that: (1) a strike or a threatened strike was a breach of the Agreement; (2) section 19.2 of the Agreement provided for interest arbitration as an impasse resolution mechanism; (3) the CTA was proceeding to interest arbitration based on the Union's rejection of the tentative Agreement; (4) the strike authorization vote or any strike failed to meet all of the explicit requirements for a lawful strike under section 17 of the Act; (4) the Agreement prohibited strikes; and (5) under Illinois law no strike of any kind was permissible.

On June 27, 2001, the CTA filed an unfair labor practice charge with the Board alleging that the Union committed an unfair labor practice by taking a strike authorization vote and threatening to strike even though its members were not permitted to strike.

Also on June 27, 2001, the Union sent a letter to the CTA requesting use of CTA's property to conduct an election on July 17, 2001, from 7 a.m. to 8 a.m. for the purpose of rerunning the delegate election at the Chicago Avenue garage. In response, the CTA sent a letter dated June 29, 2001, requesting additional information including the authorized Union representative conducting the election, the purpose of the election, and whether any outside governmental agencies would be involved in the election, and the CTA also requested a copy of the ballot to review. The Union responded to the CTA's letter by providing the requested information and indicating that a ballot could not be provided until the CTA granted permission to use the CTA's property because the location of the election needed to be included on the ballot. The Union stated, however, that after the CTA provided permission to use the property, the Union would provide the CTA with a copy of the official ballot.

On approximately July 12, 2001, the CTA sent the Union the following letter:

> "This is in response to your request to run a 'Special Delegate Election' on July 17, 2001, at Chicago Avenue Garage. As you know during a similar such election on June 26, 2001, Local 241 included a vote to authorize an illegal 'unfair labor practice strike' in violation of Local 241's representation to the CTA as to the purpose of that election. As a result, the CTA filed an unfair labor practice charge (L-CB-01-038) due to among other things the unauthorized ballot proposition.
>
> Therefore in view of the above, your request to use CTA facilities at Chicago Avenue Garage on July 17, 2001, to conduct a Special Delegate Election is denied."

As a result of this letter, the Union conducted the rerun election at a local church.

Between the first election and the rerun election, the Union prepared the following handbill:

> **"NOTICE TO THE PUBLIC**
>
> Amalgamated Transit Union, Local 241, the union that represents your CTA bus operator, is currently involved in a dispute with the Chicago Transit Authority. Although we have reached an agreement with CTA, which covers our terms and conditions of employment until December 31, 2003, the CTA is now attempting to back out of their agreement with us.

1-07-2269

Please support your bus operator in our dispute.  While we recognize that the riding public relies on CTA for its livelihood, we also rely on the CTA for our livelihood.  While we do not want to disrupt the transportation system in the City of Chicago, we may have to should the CTA continue to not respect and stand behind their agreement with us.

The bus operators of CTA ask that you stand with us in our time of need.  We need you to demonstrate your support and concern for us by calling Frank Kruesi, President of the Chicago Transit Authority at (312) 222-6102.  Let him know that CTA is a vital instrument in the lives of the riding public.  Tell him to stand behind his agreement with ATU Local 241 and their operating employees.

<u>**WE NEED YOUR HELP AND SUPPORT**</u>

Thank you,

Your CTA Bus Operator"

The Union provided approximately 4,000 copies of the handbill to CTA bus operators and instructed the employees to distribute the handbills to the general public, but not on CTA property or while in CTA uniforms.  The employees distributed the handbills to the general public at bus stops and on street corners.  In response to the handbill distribution, the CTA posted a memorandum on June 28, 2001, stating in part that: "any employee who participates in the distribution of these notices is subject to disciplinary action up to and including discharge for engaging in this activity."  The memorandum continued by stating that: "the CTA must insist

7

that you repudiate these documents and inform your members that the distribution of these notices is strictly prohibited and will subject any employee involved to disciplinary action up to and including discharge." No employees, however, were disciplined as a result of the handbill distribution.

On July 2, 2001, the CTA distributed a memorandum to every CTA employee by including the letter in the employee's paycheck, which was CTA's normal practice of communicating with employees, stating in part:

"What is not allowed under our agreement, and is also prohibited by the Illinois Public Labor Relations Act, is threatening illegal strikes and putting jobs at risk. But that is what some representatives of Local 241 have threatened to do. Make no mistake about it. An illegal job action will put jobs at risk.

* * *

If there are illegal job actions, we will take whatever legal and disciplinary measures are called for. I hope it does not come to that. It is still my hope that the rumors are only rumors and that good sense will prevail."

On July 12, 2001, the Union filed an unfair labor practice charge with the Board alleging that the CTA committed an unfair labor practice by threatening employees with discipline for engaging in protected concerted activities through its June 28, 2001, posting and July 2, 2001, memorandum to employees. On July 16, 2001, the Union filed a second unfair labor practice charge alleging that the CTA committed an unfair labor practice by refusing to allow the Union

8

to hold a rerun election on CTA property in retaliation for the strike authorization vote, which was a protected concerted activity.

On May 15, 2003, the administrative law judge (ALJ) issued an order concluding that the Union did not commit an unfair labor practice and that the CTA committed an unfair labor practice by posting its intention to enforce its no-solicitation rule and by refusing to allow the Union to hold a rerun election on its property without first seeing the ballot to be used during the election. The ALJ also concluded that the CTA did not commit an unfair labor practice by informing employees of its intention to avail itself of its statutory right to discipline employees who engage in illegal job actions. The Board on April 30, 2004, disagreed with the ALJ and concluded that the CTA committed an unfair labor practice by informing employees of its intention to avail itself of its statutory right to discipline employees who engage in illegal job actions. The Board adopted all of the ALJ's other recommendations and conclusions. The CTA appealed the Board's conclusions. On appeal, this court in its May 26, 2005, decision vacated and remanded the matter to the Board with the following directives:

> "The Board must address whether the parties 'agreed to submit the disputed issues to final and binding arbitration.' 5 ILCS 315/17(a)(3) (West 2000). If the parties were subject to arbitration, then it follows that the Board must consider whether section 17(a)(3) could have been satisfied and, therefore, whether a strike by CTA employees at the time of their dispute would have been prohibited under the Act. If the Board finds that it would have been unlawful for CTA employees to strike under section 17 of the Act, then the Board must consider whether the Union's

9

activities in furtherance of an illegal strike violated the Union's duty to bargain in good faith under section 10(b)(4) of the Act.

Additionally, if a strike would have been unlawful, the Board must also consider whether the Union's actions taken in furtherance of an illegal strike under the Act constituted protected activity. To establish a violation of section 10(a)(1) of the Act, the Union must first establish that it was engaged in 'the exercise of the rights guaranteed in this Act.' 5 ILCS 315/10(a)(1) (West 2000). The Board did not address whether actions taken in furtherance of a strike by public employees who are statutorily prohibited from striking would be exercising rights guaranteed by the Act. Accordingly, for all of the foregoing reasons, we vacate the Board's order and remand the matter to the Board to reconsider its findings in light of section 17(a)(3) of the Act." *Chicago Transit Authority*, 358 Ill. App. 3d at 91, 830 N.E.2d at 636.

Following remand, the Board on July 27, 2007, reached the same conclusions that it reached before this court remanded the matter. The CTA now appeals the Board's decision following remand.

Before addressing the merits on appeal, we deem it necessary to provide a general understanding of the pertinent terminology and policy relating to the Act. According to the Act, "[i]t is the public policy of the State of Illinois to grant public employees full freedom of association, self-organization, and designation of representatives of their own choosing for the purpose of negotiating wages, hours and other conditions of employment or other mutual aid or

protection."  5 ILCS 315/2 (West 2000).  The term "collective bargaining" refers to the "bargaining over terms and conditions of employment, including hours, wages, and other conditions of employment" as provided for under section 7 of the Act and that are not excluded under section 4 of the Act.  5 ILCS 315/3 (West 2000).  Section 7 of the Act details the duties to bargain of the public employer and employee representative.  5 ILCS 315/7 (West 2000). Section 4 of the Act relates to matters of inherent managerial policy.  5 ILCS 315/4 (West 2000). Employee activities that are " 'concerted activities for the purpose of collective bargaining or other mutual aid or protection' " are considered protected activity under the Act.  *Sierra Publishing Co. v. National Labor Relations Board*, 889 F.2d 210, 215 (9th Cir. 1989), quoting 29 U.S.C. §157 (2000).  "Concerted activity is protected if it is part of a 'labor dispute,' without being limited specifically to a strike."  *Lineback v. Printpack, Inc.*, 979 F. Supp. 831, 841 (S.D. Ind. 1997).  The focus of the instant appeal is to determine whether the Union and the employees engaged in protected concerted activity under the Act during contract negotiations and, if so, whether the CTA interfered with the protected activity thereby committing an unfair labor practice.  The fundamental basis of the issues presented for review amount to whether the Union and the CTA committed an unfair labor practice during the negotiations for a new collective bargaining agreement.

Additionally, in this appeal, we are called upon to review the Board's findings.  Here, the Board's findings include factual findings because this "court must consider whether the Union acted in a coercive manner," as well as questions of law because the terms "strike" and "coercion" as used in the Act require legal interpretation.  *Village of Skokie v. Illinois State Labor Relations Board*, 306 Ill. App. 3d 489, 492, 714 N.E.2d 87, 89 (1999).  Thus, we will employ the clearly erroneous standard of review because the Board's findings involve a mixed

question of law and fact. *Village of Skokie*, 306 Ill. App. 3d at 492, 714 N.E.2d at 89; see also

*Niles Township High School District 219 v. Illinois Educational Labor Relations Board*, 379 Ill.

App. 3d 22, 26, 883 N.E.2d 29, 34 (2007). Accordingly, we accept the Board's "findings unless

we come to the definite and firm conviction that a mistake has been committed." *Illinois Beta*

*House Fund Corp. v. Department of Revenue*, 382 Ill. App. 3d 426, 429, 887 N.E.2d 847, 850

(2008). Moreover, the clearly erroneous standard of review requires this court "to give some

deference to the agency's expertise and experience with the statute it is charged with

administering." *Illinois Beta House Fund Corp.*, 382 Ill. App. 3d at 429, 887 N.E.2d at 850.

Mindful of the standard of review applicable here, we will now address the merits of the claims

raised on appeal.

## II. ANALYSIS

### A. *Section 17(a) and Section 10(b)(4) Claims*

The CTA's first issue on appeal is that the Board on remand failed to follow this court's

express directives. The CTA contends that the Board defied this court's directives to determine

whether section 17(a)(3) was satisfied by not expressly answering the posed question. The CTA

claims that the Board's defiance to this court's directive was also evidenced by the Board

statement that "whether Local 241 met the requirements for a strike as set forth in Section 17 is

immaterial to the unfair labor practice question." Thus, the CTA claims that the Board's refusal

to follow this court's orders requires reversal of the Board's decision.

The Board and Union respond that the Board's findings substantially conformed to this

court's mandate on remand. The Board and Union claim that this court's mandate provided a

step-by-step analysis to apply in deciding whether a union's actions taken in support of a strike

that fails to comply with section 17(a)'s requirements constitutes a protected activity or violates section 10(b)(4). The Board and Union claim that the Board answered the questions posed by this court when it concluded that even if the Union did not comply with section 17(a)'s requirements, the Union's actions failed to violate section 10(b)(4) because the Board concluded that "a strike authorization vote is in all cases, activity protected by the Act." The Board's decision on remand also affirmed its view that distributing handbills is a protected activity. The Board and Union claim that the Board ruled on the ultimate question directed by this court of whether the Union's activities were protected concerted activities by answering the question in the affirmative. The Board and Union maintain that because the Union participated in protected activity, the Board did not err in finding that the Union's conduct did not amount to an unfair labor practice.

We conclude that the overall spirit of the Board's decision is consistent with this court's prior mandate. The Board and Union acknowledge that the Board's decision was not artfully worded and not clearly expressed, but nonetheless addressed the questions posed by this court and did not rise to a defiant mockery of this court's express instructions as urged by the CTA. Although the Board did not express an implicit finding addressing whether the parties agreed to submit disputes to binding arbitration, the Board concluded that regardless of whether an agreement to arbitrate existed, the Union's actions amounted to protected activity even if an eventual strike would have been illegal. Thus, the Board addressed this court's ultimate questions regarding the Union's activities and whether those activities were unprotected amounting to a violation of section 10(b)(4). Accordingly, despite the Board's failure to conduct a step-by-step analysis of the Union's conduct, the Board's findings are in unison with this court's requested end-result analysis. Thus, to promote judicial efficiency, we do not consider it

13

necessary to remand this cause for the Board to expressly state its findings with respect to the parties' agreement to arbitrate since the record and the Board's decision permit this court to now substantively address the issues on appeal.

Next, the CTA contends that the employees were prohibited from striking at any time because the requirements for a lawful strike pursuant to section 17(a) of the Act (5 ILCS 315/17(a) (West 2000)) were not satisfied. Section 17(a) states in relevant part:

> "Public employees who are permitted to strike may strike only if:
>
> (1) the employees are represented by an exclusive bargaining representative;
>
> (2) the collective bargaining agreement between the public employer and the public employees, if any, has expired, or such collective bargaining agreement does not prohibit the strike;
>
> (3) the public employer and the labor organization have not mutually agreed to submit the disputed issues to final and binding arbitration;
>
> (4) the exclusive representative has requested a mediator pursuant to Section 12 for the purpose of mediation or conciliation of a dispute between the public employer and the exclusive representative and mediation has been used; and
>
> (5) at least 5 days have elapsed after a notice of intent to strike has been given by the exclusive bargaining representative to the public employer." 5 ILCS 315/17(a) (West 2000).

The CTA claims that the above statutory provision applies to all strikes and four of the five requirements were not satisfied at any relevant time prior to the Union engaging in activities in furtherance of a strike. The CTA maintains that the Agreement between the parties had not expired since the agreement's termination occurred two years later in November 2003, when the Agreement was revised by the board of arbitration's decision. The CTA contends that the Union failed to establish that either the Agreement was not in effect during the summer of 2001 or that the parties negotiated a successive agreement. The CTA also claims that the Agreement prohibited strikes during its duration. The CTA further claims that the parties agreed to submit all unresolved bargaining disputes to final and binding interest arbitration according to section 17.1 of the Agreement, which required arbitration of all grievances between the parties, including whether the parties entered into a successor collective bargaining agreement. The CTA maintains that the Union did not request a mediator and further claims that the Union did not provide notice to the CTA of its intent to strike. Thus, the CTA maintains that the employees were prohibited from striking against the CTA at any relevant time and any act in furtherance of an unlawful strike reflects the Union's failure to bargain in good faith.

The Board and Union respond that since a strike never occurred, it is irrelevant whether section 17(a)'s five requirements for a lawful strike were satisfied prior to engaging in a strike authorization vote and other related activities. The Board and Union claim that even assuming *arguendo* that a failure to meet one of section 17(a)'s requirements would have precluded an eventual strike, the same assumption fails to automatically render a strike authorization vote a breach of the duty of good-faith bargaining. The Board and Union also claim that the parties did not agree to submit the disputed issue of whether the parties entered into a successor collective bargaining agreement to arbitration. The Union notes that the strike authorization vote occurred

after the filing of the unfair labor practice charge and the CTA did not demand arbitration prior to the vote. The Board and Union further claim that the requirements of section 17(a) could have been met prior to engaging in a strike. However, since no strike occurred, the Board and Union maintain that the Board did not err in finding that the Union did not engage in an unfair labor practice due to the failure to meet section 17(a)'s requirements.

We agree with the Board and Union's position. Turning first to the express language used in section 17(a) of the Act, we note the statute states in pertinent part that: "Public employees who are permitted to strike may strike only if * * *." 5 ILCS 315/17(a) (West 2000). The statute does not address acts in preparation or contemplation of a strike but, instead, only addresses actual strikes of public employees. Here, the facts indicate that the employees did not engage in a strike. The CTA contends that any act in preparation of an eventual strike that potentially may not have met the requirements of section 17(a) are also unlawful and demonstrate the failure to bargain in good faith, violating section 10(b)(4). We note that the Board in its July 2007 decision stated that "a strike authorization vote is in all cases, activity protected by the Act." The Board defined a strike authorization vote as being "nothing more than an internal poll of the union's membership, to seek guidance, to bolster support among its membership, or to demonstrate unity." We do not find error with the Board's definition of a strike authorization vote. Moreover, we agree that a strike authorization vote is not the equivalent of participating in an actual strike, which must satisfy five requirements for the strike to be considered lawful. See 5 ILCS 315/17(a) (West 2000); *Abadie v. Bayou Steel Corp.*, 645 So.2d 779, 781 (La. App. 1994); and *Hercules, Inc. v. Unemployment Compensation Board of Review*, 146 Pa. Commw. 77, 82-84, 604 A.2d 1159, 1162 (1992). The five statutory requirements set forth in section 17(a) pertain to the lawfulness of a strike, and the legislature in

drafting the Act did not expressly enumerate specific requirements that must be satisfied to engage in a strike authorization vote. Accordingly, we cannot conclude that the Board's finding that participating in a strike authorization vote does not amount to a strike is clearly erroneous.

We must now determine whether engaging in a strike authorization vote, posting the voting results and distributing handbills amounted to an unfair labor practice in violation of section 10(b)(4). The relevant section of 10(b)(4) states in pertinent part:

> "(b) It shall be an unfair labor practice for a labor
>
> organization or its agents:
>
> * * *
>
> (4) to refuse to bargain collectively in good faith with a
>
> public employer, if it has been designated in accordance with the
>
> provisions of this Act as the exclusive representative of public
>
> employees in an appropriate unit." 5 ILCS 315/10(b)(4) (West
>
> 2000).

The CTA claims that the Union violated section 10(b)(4) by threatening to strike even though the Union was prohibited from engaging in such an act. The CTA relies on *Local Union No. 3,* 281 N.L.R.B. 1099 (1986) (*Burroughs*), to provide an example of union conduct considered to constitute an illegal threat to strike. According to the CTA, in *Burroughs*, the union representatives' statements held to constitute a strike threat were: (1) if no agreement was reached by a certain date, the union "could strike"; (2) "there would in fact be a strike" on a specified day; and (3) a strike could not be avoided unless the employer negotiated. *Burroughs*, 281 N.L.R.B. at 1100-01. The Board adopted the ALJ's findings in *Burroughs,* which held "that the Respondent's threat to strike in order to force the Employer to negotiate a new agreement

17

after the parties' existing contract had been automatically renewed was not only in derogation of the automatic renewal clause but constituted a repudiation of the contract." *Burroughs*, 281 N.L.R.B. at 1099 n.2, 1101. The ALJ continued by stating that "[a] threat to strike during an automatic extension period violates Section 8(b)(3) and 8(d) of the Act." *Burroughs,* 281 N.L.R.B. at 1101. The CTA claims that if such threats constitute an unfair labor practice under federal labor law, then similar threats also constitute an unfair labor practice under the Act, which includes a narrower right to strike and greater potential for harm to the public from an illegal strike. The CTA contends that the Union's conduct detailed below demonstrated a strike threat:

> (1) the lockstep synchronization of the activities (the strike vote on June 26, 2001, the posting of the results the next day on June 27, 2001, and dissemination of the notice to the public the following day on June 28, 2001, threatening to disrupt the mass transit system);

> (2) the timing of the activities (right before the 4th of July holiday); and

> (3) the utter stealth that surrounded the strike vote (kept secret from the Union's executive board).

The CTA contends that the Union repudiated the collective bargaining agreement through its illegal strike preparations establishing a violation of section 10(b)(4).

The Board and Union claim that any action taken in preparation of a potential future strike did not violate section 10(b)(4). The Board and Union contend that the purpose of the strike authorization vote and circulation of the public notice was to exert pressure on the CTA to

18

accept the Union's proposed terms in the new agreement. The Union contends that such a practice is consistent with the Union's duty to seek a negotiated resolution with the CTA in good faith. The Board maintains that a strike authorization vote constitutes protected concerted activity and cannot support a claim of bad-faith bargaining even where a collective bargaining agreement prohibits employees from striking. The Board and Union, however, maintain that the employees possessed the right to strike and the strike authorization vote was not illegal. Thus, the Board and Union claim that because no strike occurred, no portion of the parties' agreement was repudiated and the Union's actions failed to amount to an unfair labor practice.

We agree with the Board and Union that the Union's actions did not violate section 10(b)(4). During labor negotiations, a recognized principle is that "although an employer and a union are both obligated under the Act to bargain in good faith, both parties may, without violating their duty to bargain, exert economic pressure on each other in an effort to secure agreement to each others' bargaining proposals." *Daily News of Los Angeles*, 315 N.L.R.B. 1236, 1242 (1994), *enforced*, *Daily News of Los Angeles v. National Labor Relations Board*, 73 F.3d 406 (D.C. Cir. 1996), citing *National Labor Relations Board v. Insurance Agents' International Union*, 361 U.S. 477, 4 L. Ed. 2d 454, 80 S. Ct. 419 (1960); *American Ship Building Co. v. National Labor Relations Board*, 380 U.S. 300, 13 L. Ed. 2d 855, 85 S. Ct. 955 (1965). Examples of economic pressures include half-day walkouts, refusals by employees to perform various job duties, lockouts and strikes. See *Daily News of Los Angeles*, 315 N.L.R.B. at 1242; *Ashcraft v. Board of Education*, 83 Ill. App. 3d 938, 947, 404 N.E.2d 983, 990 (1980). The exercise of economic pressures during the negotiation of a collective bargaining agreement "is part and parcel of the system" recognized by the Act. *Daily News of Los Angeles*, 315 N.L.R.B. at 1242, quoting *Insurance Agents' International Union*, 361 U.S. at 489, 4 L. Ed 2d at

464, 80 S. Ct. at 427. Threatening to engage in a strike does not itself amount to a failure to bargain in good faith because "there is simply no inconsistency between the application of economic pressure and good-faith collective bargaining." *Insurance Agents' International Union*, 361 U.S. at 494-95, 4 L. Ed. 2d at 467, 80 S. Ct. at 430. Moreover, conducting and participating in a strike authorization vote prior to the execution of a new labor contract is conduct considered protected under the Act. See *Village of Lyons*, 5 Pub. Employee Rep. (Ill.) par. 2007, No. S-CA-88-97 (ILLRB March 22, 1989). Generally, a strike authorization vote proceeds the final authorization to engage in a strike and voting in favor of a strike does not automatically result in the engaging of a strike against an employer. See *Transportation Management Corp.*, 257 N.L.R.B. 760, 763 (1981), *enforced*, *National Labor Relations Board v. Transportation Management Corp.*, 686 F.2d 63 (1st Cir. 1982). Thus, we agree with the Board that the Union's organization of a strike authorization vote does not represent or amount to the Union's failure to bargain in good faith.

We are also unpersuaded by the CTA's reliance on *Burroughs* to support its claim that the Union failed to bargain in good faith. We, however, do not disagree with the CTA's reliance on federal law to resolve the instant issue because section 8(b)(3) of the National Labor Relations Act (29 U.S.C. § 158(b)(3) (2000)) NLRA is the corollary to section 10(b)(4). *Village of Skokie*, 306 Ill. App. 3d at 494, 714 N.E.2d at 90. In *Burroughs*, the ALJ ruled and Board affirmed that the union's strike threats violated its duty to bargain in good faith because the collective bargaining agreement automatically renewed causing the union's strike threats to reflect an intent to force the company to terminate an existing collective-bargaining agreement prior to its expiration date. *Burroughs*, 281 N.L.R.B. at 1099 n.2. The ALJ and Board held that such a practice goes against the notions of good faith bargaining. *Burroughs*, 281 N.L.R.B. at

20

1100. Unlike in *Burroughs*, the Union's actions here did not follow an automatic contract renewal rendering an agreement newly effective nor was the Union attempting to alter the agreement's terms subsequent to it becoming effective. Rather, the agreement at issue here expired and the parties were in the process of negotiating new terms. Thus, *Burroughs* is distinguishable.

Here, we agree with the Board that the Union's actions are not indicative of a party bargaining in bad faith. The Union's actions do not demonstrate an unwillingness to negotiate toward a compromise or the lack of a serious intent to reach a common ground with the CTA. The Union participated in numerous meetings with the CTA in an attempt to resolve differences and enter into a new agreement. See generally *United Food & Commercial Workers Union*, 262 N.L.R.B. 309, 312 (1982); *Wal-Lite Division of United States Gypsum Co. v. National Labor Relations Board*, 484 F.2d 108, 111 (8th Cir. 1973). The CTA contends that the Union's failure to bargain in good faith was demonstrated by: (1) adding a strike authorization vote on an election ballot; (2) posting the results of the vote; and (3) distributing handbills to the public not on CTA premises and not during work hours informing the public of the negotiation dispute existing with the CTA and the possibility of a strike. The complained of conduct, however, even fails to rise to the level of exerting economic pressure, such as engaging in slow-downs and sit-ins on the CTA to yield to the Union's bargaining demands. *Insurance Agents' International Union*, 361 U.S. at 494, 4 L. Ed. 2d at 467, 80 S. Ct. at 430. Even assuming that such conduct did amount to exerting economic pressure, we adhere to the United States Supreme Court's position that "there is simply no inconsistency between the application of economic pressure and good-faith collective bargaining." *Insurance Agents' International Union,* 361 U.S. at 494-95, 4 L. Ed. 2d at 467, 80 S. Ct. at 430. Thus, we agree with the Board's ruling that nothing in the

21

record supports a finding that the Union failed to fulfill its statutory duty to bargain in good faith.

### B. Section 10(a)(1) Claims

We next turn to consider the CTA's actions and whether those actions amounted to a violation of section 10(a)(1), which states in pertinent part:

>    "(a) It shall be an unfair labor practice for an employer or its
>
>    agents:
>
>        (1) to interfere with, restrain or coerce public employees in
>
>    the exercise of the rights guaranteed in this Act or to dominate or
>
>    interfere with the formation, existence or administration of any
>
>    labor organization or contribute financial or other support to it;
>
>    provided, an employer shall not be prohibited from permitting
>
>    employees to confer with him during working hours without loss
>
>    of time or pay."  5 ILCS 315/10(a)(1) (West 2000).

The Illinois Supreme Court recognized the close parallel existing between section 10(a) of the Act and section 8(a) of the National Labor Relations Act (NLRA) and has deemed it appropriate to examine federal interpretations of the NLRA for guidance in resolving issues involving section 10(a) provided those decisions are consistent with the Act's purposes. *City of Burbank v. Illinois State Labor Relations Board*, 128 Ill. 2d 335, 345, 538 N.E.2d 1146, 1149 (1989).  Here, the Union filed an unfair labor relations complaint alleging that the CTA committed an unfair labor practice by posting the June 28, 2001, memorandum regarding the employee's distribution of handbills, issuing the July 2, 2001, memorandum to employees regarding their participation in

22

the strike authorization vote and other union activities and denying the Union use of CTA

property to conduct a rerun election. We will address each contention in turn below.

### 1. June 28 Memorandum

The CTA contends that its posting of notice to employees regarding its no-solicitation

rule and intent to discipline employees distributing notice to the public that threatened to disrupt

the mass transit system did not violate section 10(a)(1). The CTA claims that the Board

erroneously concluded that the Union's handbill distribution to the public amounted to a

protected activity and that the CTA did not appropriately broaden its no solicitation rule to

include a restriction of handbill distribution during non-work time and on non-CTA property.

The CTA contends that the Union's handbill distribution was not protected conduct because the

distribution was part of an illegal threat to engage in an illegal strike. The CTA also contends

that its posting did not broaden its valid no solicitation rule because the posting's language

clearly indicated that discipline would not result unless an employee violated the no-solicitation

rule itself. Thus, the CTA maintains that its posting failed to violate section 10(a)(1).

The Board and Union respond that the Board did not err in finding that the CTA's

memorandum amounted to an unfair labor practice. The Board and Union claim that the CTA's

posting violated section 10(a)(1) because the letter stated in part that employee distribution of

the public notice was "strictly prohibited" by the CTA's anti-solicitation rule and that "[a]ny

employee who does participate in the distribution of this document will be subject to disciplinary

action up to and including discharge." The Board and Union state that the Act provides public

sector employees with the right to "engage in other concerted activities not otherwise prohibited

by law for the purposes of collective bargaining or other mutual aid or protection, free from

interference, restraint or coercion." 5 ILCS 315/6 (West 2000). The Union claims that distribution of the public notice did not occur during working hours or on CTA property and thus was, as found by the Board, a lawful and protected activity. Accordingly, the Board and Union maintain that the CTA's threat to discipline employees who engaged in such activity violated section 10(a)(1)'s prohibition against interfering, retraining or coercing employees in the exercise of protected rights.

We agree with the Board's finding that the CTA's notice violated section 10(a)(1). An employer's threat of discipline and other reprisals directed toward employees engaging in union activity amounts to an unfair labor practice because the employer's conduct "reasonably tends to coerce employees in the exercise of their rights, regardless of whether it does, in fact, coerce." *National By-Products, Inc. v. National Labor Relations Board*, 931 F.2d 445, 451 (7th Cir. 1991). Stated differently, threats of discipline directed toward employees for engaging in union activity are unlawful. *J. C. Penny Co. v. National Labor Relations Board*, 123 F.3d 988, 993-94 (7th Cir. 1997); see also *Fleming Cos. v. National Labor Relations Board*, 349 F.3d 968, 973 (7th Cir. 2003). Thus, we must analyze the contents of the CTA's June 28, 2001, memorandum to determine if a threat existed. The June 28, 2001, memorandum stated in part:

> "In addition, this [handbill] notice contains a reference to disrupting the transportation system in the City of Chicago. The CTA has advised you in the past regarding illegal strike threats to coerce the CTA to accept the terms proposed by Local 241 in contract negotiations.
>
> Therefore, the CTA must insist that you repudiate these documents and inform your members that the distribution of these

24

> notices is strictly prohibited. Any employee who does participate
>
> in the distribution of this document will be subject to disciplinary
>
> action up to and including discharge."

The CTA's statement was coercive because a reasonable interpretation of the language used would lead an employee to believe that the CTA's enforcement of its no-solicitation rules and threats of discipline resulted from engaging in union organizing and related activity. See *Fleming Cos.*, 349 F.3d at 973. An employee's actions may lose the protection of being classified as "protected concerted activity" if the employee's "actions cross the lines of acceptability so that they can be characterized as 'disloyal' to the employer." *Sierra Publishing Co.*, 889 F.2d at 215.

Critical in making the distinction between protected and unprotected activity or disloyal activity is the language used in the handbill itself. Generally, "[a]ttempts by employees and labor organizations, to enlist the aid of third parties or the public falls under the protection of section 7 of the NLRA, so long as (1) the communications clearly indicate the existence of a labor dispute with the employer and, (2) the critical statements are not maliciously untrue." *Duane Reade Inc. v. Local 338 Retail, Wholesale, Department Store Union,* 6 Misc. 3d 790, 794, 791 N.Y.S.2d 288, 291 (2004); see also *Lineback*, 979 F. Supp. at 840; *Sierra Publishing Co.*, 889 F.2d at 216. During a labor dispute, employee communication regarding the ongoing labor dispute to the public is considered protected activity under the Act. See *Duane Reade Inc.,* 6 Misc. 3d at 794, 791 N.Y.S.2d at 291. Thus, the CTA's employees' dissemination of the handbill to the public delineating an ongoing dispute with the CTA, which did not make disparaging comments regarding the CTA or other comments that could be construed as disloyal remarks, was protected activity because the handbill's language related to the existing labor

dispute. See *Endicott Interconnect Technologies, Inc. v. National Labor Relations Board*, 453 F.3d 532, 535 (D.C. Cir. 2006). Moreover, the handbills not only mentioned the existing labor dispute but asked for public help and support in the labor dispute, further supporting the conclusion that the employees engaged in protected activity. See *National Labor Relations Board v. Local Union No. 1229,* 346 U.S. 464, 468, 98 L. Ed. 2d 195, 200, 74 S. Ct. 172, 174 (1953); *Lineback*, 979 F. Supp. at 840.

Turning to the CTA's response to the employees' distribution of the handbill, we note that the June 28, 2001, memorandum included the following statement: "Any employee who does participate in the distribution of these notices is subject to disciplinary action up to and including discharge for engaging in this activity." The CTA's response informing employees that they would be subject to disciplinary actions for participating in the distribution of the handbills amounts to a threat of discipline for engaging in a protected union activity. Accordingly, we agree with the Board that the CTA committed an unfair labor practice by communicating a disciplinary threat to its employees who engaged in a protected activity. *Lineback*, 979 F. Supp. at 843.

## 2. July 2, 2001 Memorandum

The CTA next contends that the Board erroneously concluded that the July 2, 2001, memorandum violated section 10(a)(1) because the memorandum reflected a correct statement of the law, which does not amount to an unfair labor practice. The CTA contends that the Board erred in concluding that the memorandum suggested that employees may reasonably fear "adverse consequences" from any "strike-related activity, such as a strike authorization vote," even though the memorandum does not refer to a strike authorization vote. Thus, the CTA

contends that the Board's interpretation of the letter must be rejected because the memorandum was directed solely against an "illegal job action," such as a strike, work stoppage or slowdown pursuant to section 17(b) of the Act.

The Board and Union claim that viewed in the context of the CTA's overall course of conduct and other communications concerning the dispute, the CTA's memorandum threatened discipline for engaging in protected activity. The Board and Union claim that this memorandum following the CTA's prior memorandum dated June 28, 2001, threatening discipline for conduct allegedly violating the company's anti-solicitation rule could reasonably be interpreted by employees as a threat of discharge or discipline for any conduct that the CTA claimed was illegal even though it was protected under the Act. The Board and Union maintain that the memorandum was intended to intimidate employees to convince them that participation in the strike authorization vote was an illegal job action and that other actions in support of a strike would also be illegal and jeopardize jobs. Thus, the Board and Union maintain that the CTA's statements in this memorandum amounted to threats to employees for engaging in protected activity and that the Board correctly held that the CTA's memorandum violated section 10(a)(1).

We agree with the Board's conclusion that the CTA's distribution of its July 2, 2001, memorandum to employees amounted to an unfair labor practice for reasons consistent with our conclusion relating to the CTA's June 28, 2001, memorandum. The July 2, 2001, correspondence communicated to employees that a perceived illegal job action would threaten existing jobs. This statement read and interpreted in conjunction with the CTA's June 28, 2001, memorandum that threatened discipline for engaging in otherwise protected activity but characterized by the CTA as illegal conduct amounted to a threat. A reasonable employee upon learning of this statement and knowing of and recalling the CTA's June 28, 2001, memorandum

would lead the employee to believe that his participation in protected concerted activities would lead to disciplinary action. *Fleming Cos.,* 349 F.3d at 973. Thus, we agree with the Board that the CTA's July 2, 2001, memorandum tended to coerce employees in the exercise of their rights and amounted to an unfair labor practice.

### 3. Use of CTA Premises

Finally, the CTA contends on appeal that the Board erred in finding that the CTA violated section 10(a)(1) by denying use of its property to the Union in July 2001 to allow the Union to conduct a rerun election. The CTA again asserts that the Union's conduct of engaging in a strike authorization vote, publication of the voting results and distribution of the handbill to the public amounted to a threat to engage in an illegal strike and, thus, was not protected activity. The CTA also contends that it rightfully denied access to the property because the Union's request to use the premises for the election did not accurately or fully disclose the purpose of the election. The CTA further claims that prior to June 2001, the Union never requested permission to use the premises to conduct a vote seeking authorization to engage in a strike. The CTA contends that the Union's prior misrepresentation regarding use of the property caused the CTA to deny use of its property for the rerun election. The CTA contends that the Union provided the CTA with ample reasons to be suspicious of its request to conduct the on-site election, and denying use of the property was not in retaliation for the previous strike authorization vote.

In response, the Board and Union contend that the evidence supports the Board's finding that the CTA's decision to deny use of the property was based on a retaliative motive against the Union for conducting the strike authorization vote. The Board and Union claim that the Board's decision was supported by the CTA's letter denying the Union's request to rerun the election

28

because the strike authorization vote was "illegal." The Board maintains that the evidence supports the Board's decision that the CTA intruded upon and manipulated the Union's internal activities in an attempt to erode union support and threaten employees with job loss for participating in Union activities. Thus, the Board and Union claim that the Board's finding that the CTA unlawfully retaliated against the Union for engaging in protected activity was not against the manifest weight of the evidence.

We agree with the Board and Union's contentions. Reviewing the Board's April 30, 2004, decision, we note that the Board recognized that the Union requested use of the CTA's property to conduct an election, which the Union had consistently done for the previous 25 years. In the instance at issue here, the Union sent the CTA a written letter requesting permission to use the CTA property at the CTA's garage on Chicago Avenue on July 17, 2001, to conduct a rerun election. The CTA in a letter dated June 29, 2001, requested that the Union disclose additional information that the CTA previously did not request concerning use of its property. The additional information included a request for the Union to submit a copy of the ballot for the rerun election because of the Union's prior strike authorization vote included on the prior ballot. We agree with the Board that the CTA's July 12, 2001, letter to the Union reflects the CTA's motive in denying use of the premises. The July 12, 2001, letter states in part:

> "This is in response to your request to run a 'Special
> Delegate Election' on July 17, 2001, at Chicago Avenue Garage.
> As you know during a similar such election on June 26, 2001,
> Local 241 included a vote to authorize an illegal 'unfair labor
> practice strike' in violation of Local 241's representation to the

CTA as to the purpose of that election. As a result, the CTA filed an unfair labor practice charge (L-CB-01-038) due to among other things the unauthorized ballot proposition.

Therefore in view of the above, your request to use CTA facilities at Chicago Avenue Garage on July 17, 2001, to conduct a Special Delegate Election is denied."

As indicated above, we agree with the Board that a strike authorization vote is protected activity under the Act and decline the CTA's request to revisit that conclusion in conjunction with this issue on appeal. Thus, our attention must focus on the Board's rationale for finding that the CTA's denial of the Union's request to use its premises amounted to an unfair labor practice. The Board concluded that the CTA denied use of its property in retaliation for the previous strike authorization vote conducted on its premises. Here, the Board and ALJ determined that the CTA's denial of the Union's request to use the property was a departure from prior established practices and the CTA requested additional information concerning the most recent use request that had previously gone unrequested. The CTA's request for the additional information amounted to a departure from the established past practice of permitting the Union use of the property upon written request identifying the proposed date, hours and location of the election. The departure of the CTA's practice of routinely permitting use of its property in addition to its letter to the Union identifying the Union's prior use of the property to conduct unlawful activities demonstrates an anti-union sentiment and supports the Board's finding of a violation of section 10(a)(1). See generally *TRW Vidar*, 290 N.L.R.B. 6, 17-18 (1988) (discussing cases involving employee access to and use of premises).

30

Moreover, employees routinely use employer's premises to conduct union elections and employers commit an unfair labor practice if denying permission to use the property is based on improper motives. See *Methodist Hospital of Gary, Inc.*, 263 N.L.R.B. 411, 416-17 (1982), *enforced*, *National Labor Relations Board v. Methodist Hospital of Gary*, 733 F.2d 43 (7th Cir. 1984). An employer's motive is a question of fact. See *Grchan v. Illinois State Labor Relations Board*, 315 Ill. App. 3d 459, 467, 734 N.E.2d 33, 40 (2000). The Board may infer an employer's anti-union motive from the following factors: "(1) the employer's expressions of hostility toward union activity; (2) the proximity in time between the employee's union activity and the employer's adverse action; and (3) inconsistencies between the employer's proffered reason for taking the adverse action and other actions of the employer." See *Grchan*, 315 Ill. App. 3d at 465, 734 N.E.2d at 39. Our task in reviewing the Board's findings of fact is not to reweigh the evidence or substitute this court's judgment for the Board; rather, we must uphold the Board's factual findings unless the findings are against the manifest weight of the evidence. *Grchan*, 315 Ill. App. 3d at 467, 734 N.E.2d at 40. In light of the CTA's past practices in routinely granting the Union permission to use the property and the letter dated July 12, 2001, demonstrating the CTA's sentiment against the Union for engaging in a strike authorization vote, which was a protected activity, a conclusion opposite of the Board's finding that the CTA violated section 10(a)(1) in denying use of its premises is not clearly evident.

Accordingly, the judgment of the Board is affirmed.

Affirmed.

O'BRIEN, P.J., and CAMPBELL, J., concurring.

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
(Front Sheet to be Attached to Each case)

CHICAGO TRANSIT AUTHORITY,

Petitioner-Appellant,

v.

ILLINOIS LABOR RELATIONS BOARD and AMALGAMATED TRANSIT UNION LOCAL 241,

Respondents-Appellees.

_____

No. 1-07-2269

Appellate Court of Illinois
First District, Fourth Division

November 6, 2008

JUSTICE GALLAGHER delivered the opinion of the court.

O'BRIEN, P.J., and CAMPBELL, J., concur.

Appeal from the Illinois Labor Relations Board.

For APPELLANT, Bell, Boyd & Lloyd LLP, Chicago, IL (James P. Daley and David M. Novak, of counsel)

For APPELLEE - ILLINOIS LABOR RELATIONS BOARD, Lisa Madigan, Attorney General of the State of Illinois, Springfield, IL (Michael A. Scodro, Solicitor General, and Ann C. Chalstrom, Assistant Attorney General, of counsel)

For APPELLEE - AMALGAMATED TRANSIT UNION LOCAL 241, Carmell Charone Widmer Moss and Barr, Chicago, IL (Lisa B. Moss and Martin P. Barr, of counsel)